AMERICAN OPTICAL CORPORATION,
Plaintiff,

v.

MEDTRONIC, INC. and A. F. Morrison
Company, Defendants.

MEDTRONIC, INC., Plaintiff,

v.

AMERICAN OPTICAL CORPORATION,
Defendant.

Civ. A. Nos. 71–11, 71–2010.

United States District Court,
D. Massachusetts.

Sept. 14, 1972.

Fredrikson, Byron & Colborn, Lawrence Perlman, Minneapolis, Minn., Tom Arnold, Houston, Tex., and Cornelius J. Moynihan, Jr., Boston, Mass., for Medtronic, Inc.

Robert D. Power, Peabody & Arnold, Boston, Mass., and Benno F. Wolff, St. Paul, Minn., for American Optical Corp.

Cornelius J. Moynihan, Jr., Peabody, Brown, Rowley & Storey, Boston, Mass., and Tom Arnold, Houston, Tex., for Medtronic, Inc. and A. F. Morrison Co.

## MEMORANDUM AND ORDER

CAMPBELL, District Judge.

The question for decision is whether Medtronic is to be forced to produce documents written by its patent counsel, for which it claims either an attorney-client privilege, a work product privilege, or both.

### I

#### A. *The Factual and Procedural Background*

Medtronic, a Minnesota corporation, is the leading manufacturer of cardiac pacemakers. American Optical (AO), a Delaware corporation principally doing business in Massachusetts, owns the two patents involved in this litigation, Patent 3,345,990 (the '990 patent), and Patent 3,528,428 (the '428 patent). The '990 patent, issued October 10, 1967, relates to a "demand" pacemaker, which stimulates the heart only in the absence of a heartbeat. The '428 patent, issued September 15, 1970, relates to a pacemaker which is protected from malfunctioning due to stray electrical interference.

In November, 1967, after issuance of the '990 patent, AO charged that Medtronic's demand pacemakers infringed the '990, and proposed that Medtronic take a license under the '990. There followed negotiations between the parties, culminating in a license agreement on November 23, 1968, which called for Medtronic to pay royalties on its devices covered by "valid" claims of the '990 patent.

Medtronic has maintained throughout this litigation, in its complaint, in affidavits, in memoranda, and in oral arguments, that the '990 patent is invalid and not infringed, and that it took a license only because patent litigation would jeopardize its contemporaneous efforts to get public financing. In its amended complaint, Medtronic alleges:

4:5 At the time the charge of infringement was made, a majority of the heart pacing devices being manufactured and sold by Medtronic were demand pacers which AO alleged to be infringing devices.

4:6 Further at the time of the charge of infringement, the nature of Medtronic's business and finances was such that Medtronic required and was seeking public financing. The uncertainty and cost of a patent litigation affecting a majority of Medtronic's product line precluded Medtronic from seeking public financing and simultaneously litigating the issues of infringement and validity of U.S. Patent 3,345,990 in spite of Medtronic's belief that the patent was invalid and not infringed.

After the license agreement was signed, Medtronic produced a demand pacemaker (Model 5843) which operates on a "rate hysteresis" principle and contains an interference-avoidance circuit. In a letter dated October 14, 1970, AO stated its belief that Model 5843 infringed both the '990 patent and the recently issued '428 patent.

On October 30, 1970, Medtronic instituted an action in the District of Minnesota, seeking both a declaratory judgment that the '990 and '428 patents were invalid and an injunction against the collection of royalties under the 1968 licensing agreement.

On January 4, 1971, AO instituted an action in this court for unpaid royalties under the 1968 licensing agreement. After its motion to dismiss in the Minnesota action was denied, AO amended its complaint in this court, asking for a declaratory judgment that the licensing agreement was enforceable, and that the '428 patent was infringed. It later filed two counterclaims in the Minnesota action which were substantially the same

as the claims in the amended complaint in the Massachusetts action.

On September 17, 1971, on AO's motion, the Minnesota action was transferred here, 337 F.Supp. 490. On December 22, 1971, Judge Wyzanski of this court ordered the two actions consolidated, and denied Medtronic's motion to dismiss (for want of venue) AO's count in its complaint alleging infringement of the '428 patent, and the corresponding counterclaim in the Minnesota action.

Medtronic's motion for certification of the venue question to the Court of Appeals, or in the alternative for transfer of the case back to Minnesota, was denied on March 24, 1972.

The present motion for an order compelling discovery was filed on May 2, 1972, and the court heard argument on May 19. It took the matter under advisement, pending the submission of the documents in question for *in camera* inspection, and the deposition of Donald R. Stone, who authored the documents. Stone was deposed on May 25, 1972, and the transcript, along with the documents, has been submitted to the court. AO has renewed its motion.

## B. *The Documents in Question*

### 1. *The Pre-License Period*

In January, 1968, Stone, an attorney admitted to the Minnesota bar and then associated with a Minneapolis law firm, was commissioned by Medtronic to study Medtronic's '990 patent. On January 15 and January 22, 1968, he wrote preliminary memoranda to the file, (Documents N(2) and N(1) ), recording results of his early research. These memoranda apparently were not delivered to Medtronic. Documents M(1) and M(2) (both January 24, 1968), "status reports" of his investigations into the file history and validity of the '990, were delivered to the President of Medtronic. Document L, (January 24, 1968) entitled a "supplemental memorandum" to the January 24 memoranda, was apparently not delivered to Medtronic.

Next in chronological order are documents containing Stone's handwritten notes. Document B, dated February 26, 1968, records a conversation with Thomas Holloran, then general counsel, and later executive vice president, of Medtronic. Document A (August 13, 1968) contains notes for a negotiating meeting with AO. Document D (August 16, 1968) is an opinion on infringement of the '990 patent. Document C (undated) contains notes about the prior art. None of these documents apparently was delivered to Medtronic.

On September 20, 1968, Stone and Holloran met with William Nealon to negotiate the license agreement. Document Z (undated) contains Stone's notes for use during the conference. It apparently was not given to Medtronic, nor was it shown to Nealon of AO. Document Y (September 23, 1968) records what transpired during the conference. It apparently was delivered to Holloran, then vice president of Medtronic. Document X (undated) also contains notes for use during a negotiating session; it apparently was not delivered to Medtronic.

Documents I and K constitute legal opinions concerning the validity of the '990 patent and the possibility of infringement thereon by Medtronic devices. Document I is dated November 22, 1968 (the day before the agreement was signed); K is undated, but probably was written on the same date. Both were delivered to Holloran.

Documents V (October 22, 1968) and W (November 1, 1968) are Stone's letters to and from a Washington lawyer; Document U is a letter from another lawyer in the Washington area. These lawyers have been identified to AO.

Document J (November 13, 1968) is a memorandum by Stone to Holloran mostly concerning a patent not relevant here, but containing a reference to the '990 patent.

### 2. The Post-License Period

Sometime after the licensing agreement was signed, Stone resumed his validity and infringement studies of the '990 patent. Documents G (August 18, 1969), Q (July 30, 1970), E(1) (July 30, 1970), E(2) (July 31, 1970) and E(4) (September 1, 1970) record the results of his investigations and conversations with various individuals concerning the '990 patent. None of these documents apparently was delivered to Medtronic officers.

Documents T (February 17, 1970), R (June 3, 1970) and E(3) (September 1, 1970) record conversations with counsel for another party charged with infringement of the same patent. Medtronic has refused to disclose the names of these parties. The documents apparently were not delivered to Medtronic officers.

Document F (September 17, 1970) records a conversation with outside counsel concerning AO's infringement action against Vitatron, Inc. over the '990 patent. This memorandum apparently was not transmitted to Medtronic officers.

Document P (October 6, 1970) is a letter to Medtronic's counsel in this litigation, concerning Medtronic's Model 5843.

Finally, document O (October 19, 1970) is a letter to a Minneapolis patent lawyer commissioning him to investigate the '428 patent. The identity of this lawyer has been disclosed to AO.

### A. The Relevance of the Documents

Initially the Court had some difficulty in ascertaining the relevance, or possible relevance, of the documents insofar as they reflected Stone's opinions, impressions, theories and conclusions.

██ On August 9, 1972, the Court posed certain questions upon which it requested supplemental briefs. These were filed, and upon a careful review of them and of pertinent cases, I conclude that the documents and Stone's opinions, impressions, theories and conclusions therein cannot, at this initial stage, be said to be so irrelevant as to warrant the denying of discovery solely or partly on the ground of their immateriality or on the ground that their required production would be unreasonable or frivolous.

### B. Attorney-Client Privilege and Work Product

██ Medtronic asserts an attorney-client privilege and/or a privilege under the work product doctrine with respect to all the documents sought to be discovered. I rule that the documents transmitted to Medtronic are protected by both the attorney-client privilege and the work product doctrine, and that those not transmitted to the client are protected by the work product doctrine.

The attorney-client privilege extends to legal advice and opinions from an attorney to his client, 8 Wigmore on Evidence § 2320 (1961 McNaughton rev.), Spray Products Corp. v. Strouse, Inc., 31 F.R.D. 244, 248 (E.D.Pa.1962). That Stone was house counsel when some of the documents were transmitted does not deny Medtronic the privilege. Natta v. Hogan, 392 F.2d 686, 692 (10th Cir. 1968); Air-Shield, Inc. v. Air Reduction Co., 46 F.R.D. 96, 97 (N.D.Ill.1968). Recordations of conversations with attorneys for clients with common interests (T, R, and E(3) ) may also be protected, see Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates, Rule 503(b), and comment on Subdivision (b), 51 F. R.D. 315.

However, even if the documents in this latter category are not protected under the attorney-client privilege, I rule that they, and the other documents in question, are work product. Rule 26(b)(3), Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In Hickman, the Court said that the work product doctrine protects the impressions, observations and opinions of a

lawyer made "with an eye toward litigation." 329 U.S. at 511, 67 S.Ct. 385, 91 L.Ed. 451. The doctrine applies not only to material prepared after an action has been commenced:

> If the prospect of litigation is identifiable because of specific claims that have already arisen, the fact that, at the time the document is prepared, litigation is still a contingency has not been held to render the privilege inapplicable. Stix Products, Inc. v. United Merchants & Manufacturing, Inc., 47 F.R.D. 334, 337 (S.D.N.Y.1969).

While the documents prepared in the post-license period were more clearly prepared in anticipation of litigation than the pre-license documents, the latter were written when litigation was certainly a contingency. AO had charged infringement, and Medtronic was faced with the question with which these memoranda were concerned, whether it should risk litigation or accept a license. It is likely that Stone would have been discouraged from recording his impressions had he known that they would be discoverable. See Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1030 (1961). The documents should be protected.

## C. *Waiver*

American Optical vigorously contends that Medtronic has waived whatever privilege it may have with respect to Stone's recorded opinions and conclusions, by its partial disclosure of those opinions and conclusions in the license negotiations with AO and in the course of this litigation. It asserts that Medtronic cannot now maintain that it always believed the patent invalid and not infringed without allowing AO the opportunity to contradict this position with whatever admissions of Stone, Medtronic's patent counsel, it may find in the Stone memoranda.

AO's argument is not without some force. I do not find that Medtronic has ever intended to waive its privilege. But

> [a] privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final. . . .
> 8 Wigmore on Evidence § 2327 (1961 McNaughton Rev.)

The question is whether the point has been reached at this stage of the litigation.

AO argues first that when Stone, during negotiations with AO with Holloran of Medtronic present, made a detailed explanation of reasons why he thought the '990 patent was invalid and not infringed by Medtronic devices, Medtronic waived its privilege with regard to *all* of Stone's opinions recorded in the pre-license memoranda.

As to this contention, I reject the notion that a party waives its privilege if its lawyer, bargaining on its behalf, contends vigorously and even in some detail that the law favors his client's position on a point in issue—whether that point is the contested validity of a patent, the contested validity of a contract, or some other matter. Bargaining, like litigation itself, partakes of the adversary procedure. Negotiated settlements are to be encouraged, and bargaining and argument precede such settlements. Clients and lawyers should not have to fear that positions on legal issues taken during negotiations waive the attorney-client privilege so that the private opinions and reports drafted by an attorney for his client become discoverable. See I.B.M. Corp. v. Sperry Rand Corp., 44

F.R.D. 10, 13, and especially n. 2 (D. Del.1968).

AO's second argument is that Medtronic has waived its privilege by disclosures during this litigation. It points to the passages in the complaint already quoted, and passages to like effect in memoranda on various motions before this Court and the Minnesota District Court. It further points out that in affidavits both Stone and Holloran have taken the position that Medtronic took a license not because of its belief that the patent was valid and infringed, but because of Medtronic's desire not to jeopardize its attempt to gain public financing.*

■ Such statements, indeed, come perilously close to waiver. Serious questions of fairness arise especially when a party makes statements under oath to secure for himself a benefit while denying his opponent, under a claim of privilege, the opportunity to contradict those statements. Partial disclosure on direct examination at trial would be a waiver as to the remainder of the privileged consultation about the same matter. McCormick, Law of Evidence, § 97 at 197 (1954). Disclosures in prior judicial proceedings constitute waiver of privilege. Green v. Crapo, 181 Mass. 55, 62 N.E. 956, 959 (1902). As Wigmore says:

> (4) The client's offer of his own or the attorney's testimony as to a *specific communication* to the attorney is a waiver as to all other communications to the attorney on the same matter. This is so because the privilege

of secret consultation is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter character is to abandon it in the former. 8 Wigmore on Evidence § 2327 (1961 McNaughton Rev.)

■ However, I conclude that the Medtronic affidavits and statements fall short of constituting waivers. For one thing, Stone's and Holloran's affidavits do not purport to disclose the contents of a specific communication to or from them. Moreover, they are pre-trial matters, not evidence. The affidavits and Medtronic's allegations of what it supposedly thought at the time the license was taken are yet to be supported by proof.

Had Medtronic partially disclosed the contents of a specific communication, it might well have waived its privilege as to that communication. If, during the course of the trial, Medtronic seeks to prove its assertion that at the time the license was taken it believed the patent invalid and not infringed, and, especially, if it relies in support of that position on testimony of Stone and/or its officers as to what was communicated among themselves, then fairness might require a ruling that the privilege was waived as respects all of those communications.

For the present, I hold that the documents are privileged, that the privilege has not been waived, and therefore that Medtronic is not required to produce them.

---

\* Mr. Holloran stated in an affidavit:
"4. In view of the foregoing, it was my belief in the fall of 1968 that the burdens of litigating the validity and infringement of the '990 patent, in time, in money, but most significantly, in exposure to possible failure of public financing, were so great as to compel as a matter of business judgment, that Medtronic yield to the payment of royalties regardless of the validity of the '990 patent—at least for a time while other alternatives could be explored and developed.
Mr. Stone stated in an affidavit:
"6. I have always been of the opinion that the '990 patent is likely invalid, but that the cost of obtaining such a determination would be exceedingly high and require years of time. I have also always been of the opinion that at least a rate hysteresis type of pacemaker does not infringe the '990 patent. . . . "

The documents in question, which were furnished to the Court for *in camera* inspection, shall be placed in a sealed envelope, shall be marked "Court's Exhibit A", and shall be impounded by the Clerk. No one may view or have access to such documents without further written order of the Court.