508

**SCM CORPORATION**

v.

**XEROX CORPORATION.**

Civ. No. 15807.

United States District Court,
D. Connecticut.

Feb. 4, 1976 and March 9, 1976.

**512**

Stephen Rackow Kaye, New York City, Jerome Gotkin, Boston, Mass., for plaintiff.

Stanley D. Robinson, Gerald L. Sobel, New York City, for defendant.

NEWMAN, District Judge.

### PRE–TRIAL RULING NO. 17

Plaintiff SCM has moved pursuant to Rule 37, Fed.R.Civ.P., for an order compelling responses to numerous interrogatories, deposition questions, and document requests; defendant Xerox claims the attorney-client privilege. The assertion of privilege arises in several different contexts.

*Xerox-Rank Organisation Negotiations*

The first context concerns negotiations between Xerox and its joint venturer, The Rank Organisation [Rank], in 1968–69. SCM seeks to require Xerox personnel to disclose what they discussed during those negotiations. At that time Xerox and Rank each had a 50% interest in the joint venture, and were negotiating Xerox's acquisition of voting and managerial control. The parties appear to assume that the substance of the statements by Xerox personnel were sufficiently related to the obtaining of legal advice to be protected by the attorney-client privilege. The issue is whether the privilege was lost because of the discussions held with Rank personnel in which that information was revealed. This requires consideration of whether Rank and Xerox had sufficiently common interests in the subject of the otherwise privileged information to warrant maintaining the privilege, or whether the disclosure to Rank defeated the requirement of confidentiality.

It is apparent from the affidavit of C. Peter McColough, then Chief Executive Officer and President of Xerox, that the statements claimed to be privileged consist of antitrust analysis by Xerox's attorneys. The key question becomes how Rank was interested in those considerations.[1] Xerox has not established that the discussions with

---

1. Note, *Waiver of Attorney-Client Privilege on Inter-Attorney Exchange of Information*, 63 Yale L.J. 1030, 1035 (1954).

Rank revolved around the possibility of shared exposure to antitrust liability. Instead, it appears that Rank was only indirectly concerned with Xerox's antitrust posture in that Xerox was a joint venturer. As McColough testified, the meetings and statements discussed "legal considerations affecting Xerox as they related or as they might relate to the matters being negotiated." McColough Deposition, Tr. 2251–52 (May 1, 1975). Rank's interest in the negotiations does not appear to be that of a potential co-defendant in a possible antitrust action. Rather, it was negotiating the price for relinquishing voting and managerial control in Rank-Xerox to its formerly equal partner. On that issue the parties were not commonly interested, but adverse, negotiating at arm's length a business transaction between themselves.

The differing business interests of Xerox and Rank are apparent from the course of the 1968–69 negotiations. The communications in question took place during protracted negotiations between joint venturers, but were not directed at advancing the joint interest vis-a-vis the rest of the world. Instead the parties were negotiating a business proposition between themselves. That the overall profitability of the joint enterprise was a general consideration in which both parties' interests converged does not lessen the significance of their divergent interests. Their interests regarding antitrust considerations were not sufficiently common to justify extending the protection of the attorney-client privilege to their discussions. McColough is, therefore, instructed to answer the four questions asked of him and now in dispute. McColough Deposition, Tr. 2240, 2252–54 (May 1, 1975).

The cases relied upon by Xerox are distinguishable. In *Continental Oil Co. v. United States*, 330 F.2d 347 (9th Cir. 1964), the exchange of information about grand jury questioning occurred among potential co-defendants. In *Hunydee v. United States*, 355 F.2d 183 (9th Cir. 1965), the pre-indict-ment conference was held to apprise each defendant of the other's situation and intended plea. The court treated the exchange as intended to facilitate representation in the coming proceedings and apparently considered the matters of common interest to predominate over the adversity between the interests of the parties. The impending indictment of both parties as participants in the same illegal transaction presented a situation that justified applying the privilege to conversations with their attorneys at a conference between them, as if they were co-defendants. The interests of Xerox and Rank do not approach that level of common defense.

In *Stanley Works v. Haeger Potteries, Inc.*, 35 F.R.D. 551 (N.D.Ill.1964), and *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974), courts considered the parties' interests in joint licensing programs sufficiently in common to justify protecting communications between the interested parties in preparation for trials in which their common business interests were involved.

Each of the protected communications in cases cited by Xerox was an instance in which the parties were involved in or anticipating litigation. The privilege need not be limited to legal consultations between corporations in litigation situations, however. Corporations should be encouraged to seek legal advice in planning their affairs to avoid litigation as well as in pursuing it. The timing and setting of the communications are important indicators of the measure of common interest; the shared interest necessary to justify extending the privilege to encompass intercorporate communications appears most clearly in cases of co-defendants and impending litigations but is not necessarily limited to those situations.[2]

*Xerox-Battelle Antitrust Discussions*

Xerox asserted the attorney-client privilege when Sol M. Linowitz, former Xe-

**2.** *See* Note, *The Attorney-Client Privilege in Multiple Party Situations*, 8 Colum.J.L. & Soc. Prob. 179, 189 (1972).

rox counsel and former member of its Board of Directors, was asked about a discussion he had with Battelle executives on the subject of antitrust. Xerox and Battelle may be considered to have shared sufficiently common interests in the exploitation of certain xerography patents so that the attorney-client privilege would appropriately apply and protect their joint discussions on topics of common interest. *Cf. In re Yarn Processing Patent Litigation,* 177 U.S.P.Q. 514 (S.D.Fla.1973); *Burlington Industries v. Exxon Corp., supra; Stanley Works v. Haeger Potteries, Inc., supra.* But their individual postures relevant to the antitrust discussions in point are undefined. In order for the Court to make an informed determination, Linowitz is directed to submit to the Court for its *in camera* inspection his affidavit setting forth his best recollection of conversations he had with John Gray and John Crout, Battelle executives, in which antitrust matters were discussed during the period prior to the 1956 Xerox-Battelle agreement. See Linowitz Deposition, Tr. 421 (Oct. 10, 1975). This recounting of what each man said should assist the Court in determining whether the interests of their respective companies were sufficiently in common with regard to the particular issues discussed to justify application of the privilege.

The deposition question asked of Linowitz on July 2, 1974, at page 193 concerning the Rochester meeting should be answered. The discussion between Joseph Wilson and Linowitz of Xerox and Crout of Battelle recounted discussions that had taken place before the first Xerox-Battelle agreement. There has been no showing of common interest, or of legal consultation at that discussion. While the question was not renewed in all its parts at the time of the deposition, SCM has pressed it on this motion. Since the claim of privilege is denied,

the question should be answered. Linowitz Deposition, Tr. 193 (July 2, 1974).

### The Patent Committee

■ A related area of dispute is the applicability of the privilege to the committee of Xerox and Battelle representatives that considered the xerography patent structure. While all work of the committee is not necessarily privileged, the requisite common interest to satisfy the confidentiality aspect of the privilege appears to have been present on the subject of the development of xerographic technology and related patent rights. Chester Carlson, Battelle, and Xerox shared a business interest in the successful exploitation of certain patents. Whether the legal advice was focused on pending litigation or on developing a patent program that would afford maximum protection, the privilege should not be denied when the common interest is clear. *Cf.* 8 Wigmore, Evidence § 2294 (McNaughton rev. 1961). In this setting of joint analysis and cooperative study, the three parties' common interests in patent protection predominated. *Cf. In re Yarn Processing Patent Litigation, supra; Burlington Industries v. Exxon Corp., supra; Stanley Works v. Haeger Potteries, Inc., supra.* The Court has examined the excised portions of the Battelle memorandum requested during the deposition of Dr. John H. Dessauer on October 25, 1974, at page 380, and found them to concern litigation and patent matters. They remain protected. The letter from Linowitz to Frank Steinhilper, both Xerox attorneys, does not lose its privileged character because it requested preparation of a presentation to be shared with Battelle, nor because of the reference to the opinion of Carlson. PX 336A. The question asked of Dr. Dessauer on October 30, 1974, at page 19, calling for an evaluation of basic patent protection asks for legal advice and need not be answered.[3]

---

**3.** *See Inquiry into Reasons for Decisions and State of Mind, infra.*

The following question asked what Dr. Dessauer considered to be the "technical advantage." Dessauer Deposition, Tr. 19 *ll.* 9–20 (Oct. 30, 1974). That question appears to be

directed at business considerations, *e. g.,* an evaluation of products with those of competitors. Dr. Dessauer did discuss that question later in his deposition testimony. *Id.* at 32–34. Dr. Dessauer should have also answered the

*Patent Information*

██ Xerox resists SCM's document request, Dessauer Deposition, Tr. 48 (Nov. 1, 1974), by asserting the attorney-client privilege but has failed to establish that the documents represent or reveal confidential communications from client to attorney. On the contrary, the documents are memoranda prepared by attorneys in the Xerox patent department.[4] Ralabate Affidavit 3. They contain much public information (patent numbers, holders, dates of application and issuance), brief descriptions of the patents, and what Xerox characterizes as legal opinions regarding patent applicability. The public information is not protected. See *United States v. Silverman,* 430 F.2d 106, 121–22 (2d Cir. 1970); *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 359 (D.Mass.1950). The technical information is probably discoverable as facts within the knowledge of Xerox. See *City of Philadelphia v. Westinghouse Elec. Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962). Legal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality. See *Natta v. Zletz,* 418 F.2d 633, 637–38 (7th Cir. 1969). Whatever legal judgments are contained in the documents would merit protection, if at all, as work product, not by application of the attorney-client privilege. *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451, 460 (1947).

██ Xerox's alternative claim to work product protection fails for another reason. Only PS 22049 and PS 91380 are specifically claimed to have been prepared in anticipation of litigation, Xerox Memorandum p. 165, and examination of the other documents does not reveal any basis from which to infer that they were sufficiently connected to litigation to merit protection. While some authority exists for broadly construing how far litigation may be anticipated, see *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454 (N.D.Ill.1974); *American Optical Corp. v. Medtronic, Inc.,* 56 F.R.D. 426 (D.Mass.1972); *Stix Products, Inc. v. United Merchants & Manufacturing, Inc.,* 47 F.R.D. 334 (S.D.N.Y.1969), no decision has stretched the concept to the extent requested here. A specific claim must have arisen to make the prospect of litigation identifiable in order for the work product rule to apply. See *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp., supra; Abel Investment Co. v. United States,* 53 F.R.D. 485 (D.Neb.1971); *Technograph, Inc. v. Texas Instruments, Inc.,* 43 F.R.D. 416 (S.D. N.Y.1967).

██ Xerox has failed to establish the strict applicability of either the attorney-client privilege or the work product doctrine. Nevertheless, this Court retains some hesitancy about forcing counsel to hand over documents concerning its patents to a party opponent. *Cf. Hickman v. Taylor,* 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451, 462 (1947). On this motion, the balance between discovery policies and hesitancy to unlock an adversary attorney's file will be struck in favor of disclosure. Here the requested documents reveal lists of patents and their commercial uses according to Xerox's patent department. Were this simply a patent case such discovery might not be allowed because, in listing patents, the lawyer's implicit judgments as to coverage might be significant. But in the context of this antitrust action the detail of the material to be disclosed may be probative with-

---

earlier question now in dispute and is directed to do so.

4. This discussion is particularly concerned with PS 91130, PS 91378, PS 1741, PS 21189, PS 90299, PS 91459, and PS 91465.

Other documents submitted for *in camera* inspection involve requests from third parties for lists of patents promised by legends on certain Xerox machines and Xerox internal communications in preparing its responses. PS 296, PS 101387, PS 101390, PS 101391, PS 101392, PS 101393. The internal documents were circulated between Xerox patent attorneys and the office of its general counsel. Legal opinions regarding patent coverage contained in these documents were ultimately revealed to the third parties and confidentiality thereby relinquished. The other content of the documents merely reveals the mechanics of responding to the intercorporate inquiry and does not merit the protection of the privilege.

out any regard to a lawyer's judgment as to the coverage of any particular patent. What will be important will be whether SCM can establish that Xerox retained a large number of unused patents. No claim to protection having been sustained, the documents submitted in response to this discovery motion and so far discussed should be produced to SCM.

 PS 22049 and PS 91380 are claimed to have been prepared in connection with a 1970 patent infringement suit. Once having been work product, these documents do not automatically lose that protection in subsequent litigation. *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 487 F.2d 480 (4th Cir. 1973); see *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 557 (2d Cir. 1967); *cf. Midland Investment Co. v. Van Alstyne, Noel & Co.,* 59 F.R.D. 134 (S.D.N.Y.1973). It is not clear whether the series of patent infringement suits filed by Xerox against IBM has been concluded or whether the underlying dispute has been settled. So, while this antitrust action was not the litigation "viewed" by Xerox attorneys preparing these papers, the legal opinions and facts contained therein may remain protected as work product. Compare *Republic Gear Co. v. Borg-Warner Corp., supra,* with *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 509 F.2d 730 (4th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). Furthermore, SCM has not demonstrated substantial need for these specific materials, nor any undue hardship in being able to obtain substantially equivalent information. Fed.R.Civ.P. 26(b)(3).

 The interrogatories present somewhat different questions. Interrogatory 62 asks for (a) identification of each patent used in Xerox duplicators and (b) identification of each presently pending patent application. It is uncontested that from the 1950's until approximately January, 1972, when a change in policy was implemented, Xerox had affixed data plates to its machines either listing the patents used or representing that a list of patents used in those machines would be supplied

upon request. That policy and the reinforcing testimony of Linowitz establish that such patent information was not intended to be kept confidential during that time period, and it is not now protected. Xerox should answer interrogatory 62(a) as it relates to models that bore such legends. See 8 Wigmore, *supra,* § 2311.

Xerox need not express its opinions as to which patents were used in its machines after January, 1972, when a change in its policy of disclosure was implemented, nor as to duplicators that never carried a legend promising disclosure. Xerox's responses to third-party requests for patent information before the change in policy did not include the listing of patents pending, and there is no indication that Xerox ever intended to make public its opinions concerning which pending patents were employed in its products. That information need not be disclosed now. These aspects of the interrogatory requests not simply duplicative of the document discovery would require Xerox to formulate opinions not required to particularize any of its own claims. It is also the type of burdensome trial preparation that Xerox need not undertake for SCM, especially in light of the document discovery being granted. See Pre-Trial Ruling No. 12 at 3 (May 29, 1975). Similarly, interrogatory 63 need not be answered—it concerns Rank-Xerox and Fuji-Xerox duplicators.

*Inquiry into Reasons for Decisions and State of Mind*

 In this group of questions the issue is whether SCM may ask for reasons underlying particular decisions or actions when the answer will reveal legal advice received and thereby disclose a privileged conversation between client and attorney. Communications by the attorney to the client in the consultation process are privileged when they state or imply facts communicated to the attorney in confidence. See *United States v. Silverman, supra,* 430 F.2d at 122. The claims to privilege by Xerox executives will not be circumvented by framing the question to request reasons for a decision when there is every indication

that those reasons are *limited* to reliance on protected legal advice. It is true that a client's knowledge of facts may not be cloaked under the attorney-client privilege by incorporating a statement of those facts in a communication to the attorney. But privileged advice does not lose its protection when the client adopts it. To allow a litigant to probe beyond the assertion of privilege to the substance of the legal advice because the client takes that advice to heart and acts upon it would effectively circumvent the protection of the privilege. For this reason when a deponent answered a question about his reasons by saying that he was only relying on his attorney's legal advice, that answer is a sufficient response. Dessauer Deposition, Tr. 71 (Dec. 5, 1974); Linowitz Deposition, Tr. 568 (Nov. 25, 1974).

Along the same lines, when SCM asked for considerations or asked questions to elicit what it characterizes as a state of mind, and the response clearly indicated that the deponent was relying on legal advice, the attorney-client privilege will apply. McColough Deposition, Tr. 922 (June 26, 1974), 967 (Sept. 20, 1974), 1648 (Dec. 20, 1974); Dessauer Deposition, Tr. 19 (Oct. 30, 1974).[5]

A related problem arises with respect to a group of deposition questions asking McColough for the reasons or considerations involved in decisions to grant or refuse licenses; he responded that the business and legal reasons were so interwoven that he could not answer without disclosing privileged conversations. By contrast to the groups of questions just discussed, to which a deponent responded that he relied upon the advice of counsel, in his answers McColough recognized that both legal and business considerations were involved. The mere mention of business considerations is not enough to compel the disclosure of otherwise privileged material. See *United States v. United Shoe Machinery Corp., supra,* 89 F.Supp. at 359. Here it is not clear that the decisions were the type in which business personnel defer to the recommendation of legal staff. Licensing decisions may contain a legal component, but are not inherently dependent on legal advice; they are essentially business decisions. Legal advice should remain protected along with "nonlegal considerations" discussed between client and counsel that are relevant to that consultation, but when the ultimate decision then requires the exercise of business judgment and when what were relevant nonlegal considerations incidental to the formulation of legal advice emerge as the business reasons for and against a course of action, those business reasons considered among executives are not privileged. They are like any other business evaluations and motivations and do not enjoy any protection because they were alluded to by conscientious counsel. To protect the business components in the decisional process would be a distortion of the privilege. The attorney-client privilege was not intended and is not needed to encourage businessmen to discuss business reasons for a particular course of action. See Simon, *The Attorney-Client Privilege as Applied to Corporations,* 65 Yale L.J. 953, 955–56 (1956); *cf. City of Philadelphia v. Westinghouse Elec. Corp., supra.*

McColough has stated that he was concerned with both business and legal aspects of the licensing decisions. Since McColough was unable to separate these aspects he is ordered to answer the eight questions listed below in an affidavit to be submitted for *in camera* inspection and describe the decisionmaking process so that the Court may determine whether the business considerations are the type of "relevant nonlegal considerations" incidental to legal consultation referred to by Judge Wyzanski in *United States v. United Shoe Machinery Corp., supra.* McColough Deposition, Tr. 251 (June 18, 1974), 1494, 1496–97, 1504–05 (Dec. 19, 1974), 1663 (Dec. 20, 1974), 1783 (Mar. 3, 1975), 1819, 1827 (Mar. 4, 1975).

Finally, the four questions asked to elicit the evaluation of business interests

---

**5.** It is apparent that the response to the question asked Dr. Dessauer on April 23, 1975, at 29–30, would encounter the same claim, reliance on legal advice.

affected by the eventual expiration of the basic Carlson patents should be answered. Dessauer Deposition, Tr. 370 (Oct. 25, 1974), 71 (Oct. 31, 1974); Linowitz Deposition, Tr. 525, 527 (Nov. 25, 1974). While those business interests might ultimately be influenced by the strictures of law, basic *business* effects, considerations, and policy should be disclosed. The substance of particular legal advice is not ordered to be revealed; patent or antitrust advice from counsel may remain undisclosed.

### Communications Between Executives [6]

■ This group of questions involves communications between Xerox executives. A privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation. See *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp., supra,* 62 F.R.D. at 456; *United States v. Aluminum Company of America,* 193 F.Supp. 251, 253 (N.D.N.Y. 1960). It would be an unnecessary restriction of the privilege to consider it lost when top management personnel discuss legal advice. For this reason Dr. Dessauer's claim to privilege on November 1, 1974, page 58, is sustained.

■ As previously discussed, however, business factors relevant to a corporate decision are not entitled to protection unless they are merely incidental considerations helping to inform the legal advice. When the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected because legal considerations are also involved.

■ Dr. Dessauer was asked a series of questions about the discussions that led to his vote authorizing the acquisition of Rank-Xerox stock from Rank. Dessauer Deposition, Tr. 89 *l.* 20, 90 (Apr. 23, 1975).

Were the discussions intended to communicate confidential legal considerations, he would possess a valid claim to privilege since his testimony was that no business reasons for the purchase were shared with him that he could recall. See *id.* at 88 *l.*5, 90, *l.* 19, 91 *l.* 17. Since those legal considerations appear to have been shared with Rank, however, the requisite confidentiality is lacking, and Dr. Dessauer is directed to answer the questions.[7]

■ McColough's conversations with Wilson about potential future antitrust problems took place against a background suggesting that they were discussing the recent recommendation of their corporate counsel concerning licensing policy and antitrust implications. A discussion between executives of legal advice should be privileged. McColough Deposition, Tr. 934 (Sept. 20, 1974). Similarly when McColough was asked what he knew and what Wilson had said about the scope of patent coverage and he answered that everything he and Wilson knew about Xerox's patent coverage came from its lawyers, the privilege attached. *Id.* 1730–32 (Mar. 3, 1975). That privilege would not extend blanket protection over Wilson's business evaluations of the best way to proceed as an enterprise, however. Conversations between executives about the company's business policies are not protected. See *United States v. International Business Machines Corp.,* 66 F.R.D. 206, 210 (S.D.N.Y.1974).

■ McColough was asked on June 19, 1974, at page 319, whether there had been any discussions of the impact of bringing a patent infringement suit on IBM's marketing efforts. The process leading to the decision whether to sue or not is the type of decisionmaking process that requires the best informed recommendation of counsel and the fullest cooperation of the client.

---

6. Xerox has withdrawn its claims to privilege for the documents requested at Dr. Dessauer's deposition on October 30, 1974, at page 67, and February 12, 1975, at page 94.

7. Ordinarily he would only have to answer a question asking his reasons for voting in a particular way as a director by revealing his business reasons. Dessauer Deposition, Tr. 89 *l.*5 (Apr. 23, 1975). Here his reasons should also include the legal considerations that were shared with Rank during negotiations.

Still, discussions separate from substantive legal considerations that eventually feed into the corporate decision and are directed at the possibility of securing a business advantage should not be protected. The question should be answered.

Linowitz was asked a series of questions about discussions with Wilson concerning the readjustment of the Xerox-Battelle relationship. Linowitz's claim to privilege extends only to substantive legal discussions not shared with Battelle. Linowitz Deposition, Tr. 447 (Oct. 10, 1974). It is hard to see how the value Xerox placed on the rights to future technology developed by Battelle could be considered privileged since that value must have been a subject of negotiation with Battelle. The question asked of Linowitz on October 10, 1974, at page 460, should be answered. The question asked of him on November 25, 1974, at page 532, is moot.

Dr. Dessauer asserted the privilege when asked whether he had ever recommended that Xerox act to prevent another company from becoming a competitor. Dessauer Deposition, Tr. 72–74 (Dec. 5, 1974). In order to resolve the claim of privilege, Dr. Dessauer should submit for *in camera* inspection his affidavit setting forth the circumstances of any discussion in which he made such a recommendation, with whom he was speaking and what he said.

*Waiver*

In PX 89, a letter from Linowitz to Wilson reporting a meeting with an IBM executive and a discussion of licensing, 12 lines have been excised that contain legal evaluations by Linowitz. McColough Deposition, Tr. 959 (Sept. 20, 1974). SCM claims that PX 212 discloses the substance of Linowitz's advice and vitiates the protection otherwise attaching to that statement. Xerox argues that the crucial sentence in PX 212 was left in it through inadvertence. Xerox points to the fact that the initial production of the document to the FTC did not include the critical reference. Xerox's affidavits imply that after documents were screened for production to the FTC they were thereafter simply copied en masse and not examined again for privileged information. If that was the case, the somewhat troublesome claim of inadvertence will be accepted and the claim to privilege sustained. If the documents were, in fact, individually screened for privileged material before being forwarded to Litton, IBM, and SCM, the repeated inclusion of the statement would not be easily excused. On the state of the affidavits as they now stand, the claim of inadvertence is upheld and no waiver established. Accordingly, McColough need not answer the questions asked on June 26, 1974, at page 869, and on September 20, 1974, at page 957, of his deposition.

SCM's waiver argument is stronger concerning the Cole memorandum. McColough Deposition, Tr. 986 (Sept. 20, 1974). Recent testimony, Linowitz Deposition, Tr. 10–12 (Nov. 18, 1975), reveals that much of the substance of Whitney North Seymour's advice concerning IBM's licensing request, the subject of the memorandum, was shared with IBM. The disclosure goes to the substance and strategy of Seymour's analysis and is sufficient to constitute a waiver of the section of the Cole memorandum entitled *IBM*, at 3–4. McColough should also answer the related question asked of him on June 26, 1974, at pages 867–68.

Dr. Dessauer's colloquy with counsel concerning whether he believed Xerox could take advantage of the patent system and the impact of antitrust laws did not waive any attorney-client privilege. Dessauer Deposition, Tr. 25–26 (Apr. 23, 1975). He merely testified that Xerox retained counsel and endeavored to follow his legal advice. The substance of those legal consultations may remain privileged. Dessauer Deposition, Tr. 30 (Apr. 23, 1975).

SCM asks, on the ground of waiver, that McColough be instructed to answer a question about Wilson's statements concerning the scope and extent of Xerox's patent coverage. As the factual predicate for this conclusion, SCM recites numerous

public statements by Xerox executives. These statements are general, vague, and conclusory. In substance they reveal that Xerox thought patents important to its business, that Xerox held hundreds of patents, and that Xerox considered itself to be successfully pursuing a powerful patent position. These self-interested characterizations may have had some public relations benefit, but they hardly amount to a waiver. See *Bose Corp. v. Linear Design Labs, Inc.,* 71 Civ. 3103 (S.D.N.Y. Mar. 10, 1975).

SCM also urges waiver based on certain disclosures that Xerox claims were inadvertently made during extensive document production. On the basis of the Xerox affidavits, the inadvertence is sufficiently established to preclude the use of these disclosures as grounds for waiver. The claim to privilege is sustained, and related questions need not be answered. McColough Deposition, Tr. 1730 (Mar. 3, 1975).

The claim of waiver because of Wilson's letter to William Call, PX 370, stating that the whole Electrofax development was dominated by basic xerographic patent protection, is denied. Linowitz Deposition, Tr. 775 (Jan. 1, 1975). While more specific than the other statements of Xerox executives, this disclosure does not rise to the level at which fairness would demand that the privilege cease. See 8 Wigmore, *supra,* § 2327. Finally, SCM's claims of waiver as to infringement of Xerox patents are also denied. McColough Deposition, Tr. 251 (June 18, 1974), 1648 (Dec. 20, 1974).

The Court expects that the decisions expressed in this ruling will provide sufficient guidance to the parties to enable them to resolve any remaining disputes as to the availability of the attorney-client privilege. Obviously resort to the Court every time a deposition question encounters a claim of privilege is impractical. If hereafter an issue of privilege arises in a context reasonably governed by this ruling, and a party either asserts the privilege or claims its unavailability in contravention of the deci-

sions in this ruling, significant sanctions will be imposed. ·

## PRE–TRIAL RULING NO. 19

### l.

This Ruling, prompted by Xerox's motion for reconsideration of certain aspects of Pre-Trial Ruling No. 17, concerns primarily the availability of the attorney-client privilege to protect disclosure of documents prepared by attorneys in Xerox's patent department. Xerox asserts privilege on the ground that these documents include legal opinions of its patent attorneys concerning the coverage of particular machines by specified patents. Whether reconsideration can produce the clarification Xerox seeks is in some doubt, but since the issue arises in a field plagued by vague and often inconsistent judicial decisions, it may be useful to attempt a further discussion of the problem.

1. An initial question is whether the privilege protects all advice from attorney to client, or only advice that reveals (by adoption or implication) a fact communicated in confidence by the client to the attorney. The narrow position was set forth with emphatic precision by Judge Wyzanski in his oft-cited opinion in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358 (D.Mass.1950) ("the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding . . . "). Among cases explicitly adhering to this view are *Colton v. United States,* 306 F.2d 633, 637 (2d Cir. 1962); *United States v. International Business Machines Corp.,* 66 F.R.D. 206, 211–12, 215 (S.D.N.Y.1974); *Bird v. Penn Central Co.,* 61 F.R.D. 43, 46 (E.D.Pa.1973); *Sperti Products, Inc. v. Coca-Cola Co.,* 262 F.Supp. 148, 149, 151 (D.Del.1966); *American Cyanamid Co. v. Hercules Powder Co.,* 211 F.Supp. 85, 87, 90 (D.Del.1962).[1] See also McCormick, *Evidence* § 93 (1954).

---

1. It is probably fair to include in this category *8 in 1 Pet Products, Inc. v. Swift & Co.,* 218

F.Supp. 253 (S.D.N.Y.1963). It states "the advice of counsel based upon the confidential

The broader position, protecting any legal advice from attorney to client, is supported by Dean Wigmore, 8 Wigmore, *Evidence* § 2320 (McNaughton Rev.1961), and has been stated in some decisions, *e. g., Natta v. Hogan,* 392 F.2d 686, 692–93 (10th Cir. 1968); *American Optical Corp. v. Medtronics, Inc.,* 56 F.R.D. 426, 430 (D.Mass.1972) (alternate holding). Other decisions such as *Jack Winter, Inc. v. Koratron Co.,* 54 F.R.D. 44, 46 (N.D.Cal.1971), and *United States v. Aluminum Co. of America,* 193 F.Supp. 251, 253 (N.D.N.Y.1960), have implied the use of a broad rule, but without noting whether or not the advice was based on a fact communicated by the client. That the advice was actually based on such a fact seems likely in some of these cases. Indeed, the *ALCOA* ruling states the broader rule but specifically cites the narrower *United Shoe* standard as "outlining the requirements to be shown by the party asserting the privilege." *Id.* at 252.

This split in authority is further complicated by two decisions within this Circuit. In *Georgia-Pacific Plywood Co. v. United States Plywood Corp.,* 18 F.R.D. 463 (S.D.N.Y.1956), then District Judge Kaufman quoted Judge Wyzanski's formulation of the narrow standard and then observed, "Since communications by the attorney to the client might reveal the substance of a client's communication they are also within the privilege." *Id.* at 464. Again, the statement of a broader rule coupled with citation to the narrower *United Shoe* standard is perplexing. I think it unlikely that Judge Kaufman intended to abrogate the limitation contained in Judge Wyzanski's formulation, which he quoted at length. Perhaps Judge Kaufman meant only that if it is not clear whether the communication from the attorney relates to a fact disclosed to him by the client, the privilege should apply to guard against the *risk* of revealing

client confidences. That approach would simply ease the client's burden of demonstrating that the privilege applies, but would not extend the privilege to communications from the attorney that demonstrably do not relate to facts disclosed by the client.

In *United States v. Silverman,* 430 F.2d 106 (2d Cir. 1970), the issue was the relatively easy one of whether the privilege protected against disclosure at trial of an attorney's report to a client union that disclosed minutes of a union meeting. The Second Circuit held that the report was not privileged since no confidential communication was involved, the minutes being public records. The uncertain significance of the decision arises from the inclusion and subsequent deletion of a paragraph that specifically articulated the narrow standard, protecting communications from attorney to client only when they reveal confidential communications from client to attorney. *Id.* at 122. Upon petition for rehearing, the Court of Appeals deleted this paragraph from its prior opinion. *United States v. Silverman,* 439 F.2d 1198 (2d Cir. 1970). This was done "to avoid any . . . impression" that the earlier opinion made "an exception to the attorney-client confidential communication rules." *Ibid.* Xerox contends that the deletion demonstrates the Second Circuit's rejection of the narrow standard. I agree with Judge Edelstein that the deletion should not be given such significance. *United States v. International Business Machines Corp., supra,* 66 F.R.D. at 215. Neither the inclusion nor the deletion of the paragraph had any bearing on the *Silverman* holding, which rested entirely on lack of confidentiality. It is as likely that the paragraph was deleted because it was unnecessary as because it was an incorrect statement of the law. Or the

communications of a client is privileged." *Ibid.* It also states "legal advice rendered to a corporation by an attorney in its employ falls within the attorney-client privilege." *Ibid.* This appears to be a statement that house counsel are within the scope of the privilege, without broadening the privilege to dispense with the requirement of advice based on confidential

communications from the client. The citation to *United Shoe* points in that direction, although the citation to the broader rule stated in 8 Wigmore, *Evidence* § 2320 (McNaughton Rev.1961) points the other way. *See also J. P. Foley & Co. v. Vanderbilt,* 65 F.R.D. 523, 526 (S.D.N.Y.1974).

Court may have been concerned that the deleted paragraph, describing attorney's advice as unprivileged unless it has the *effect* of revealing client confidences, stated the narrow standard too strictly; advice that risks disclosure of client confidences is entitled to protection, even under the narrow standard. See *Georgia-Pacific Plywood Co. v. United States Plywood Corp., supra.* Moreover, the *Silverman* opinion, even as modified, cites with approval the Court's prior decision in *Colton v. United States, supra,* which supports the narrow standard.

■ One other source of "guidance" should be noted. The Federal Rules of Evidence, as originally proposed by the Supreme Court, contained a detailed provision for the attorney-client privilege, which dispensed entirely with the qualification that the attorney's advice relate to facts communicated by the client. See proposed rule 503(b), 56 F.R.D. 183, 236 (1972). The proposed rule would have protected any confidential communication from attorney to client "made for the purpose of facilitating the rendition of professional legal services to the client." Inexplicably the Advisory Committee's Note does not discuss the two lines of authority on this point, nor even mention the choice implicitly made. While the proposed rules, even to the extent rejected by Congress, are nonetheless some evidence of "the principles of the common law" that are to govern privilege questions arising under claims founded on federal law, Fed.Rules Evid. Rule 501; see *Eutectic Corp. v. Metco, Inc.,* 61 F.R.D. 35, 38 n.1 (E.D.N.Y.1973), I cannot accept proposed rule 503(b) as authoritative, especially in view of the total absence of any reasoned explanation from the drafters for resolving an unsettled question. See *Duplan Corp. v.*

*Deering Milliken, Inc.,* 397 F.Supp. 1146, 1160–61 (D.S.C.1974).

■ I see no reason to broaden the privilege beyond the narrow standard as set forth in *United Shoe.* The purpose of the privilege is to insure that the client may confide in his attorney to obtain legal advice. Unless the legal advice reveals what the client has said, no legitimate interest of the client is impaired by disclosing the advice. Wigmore's discussion of the broader standard concedes that it is not based on "any design of securing the attorney's freedom of expression." 8 Wigmore, *supra,* § 2320, at 629. His rationale is twofold: to prevent use of the attorney's statements as admissions of the client or as revelations of the client's communication. The latter reason, of course, is safeguarded by the explicit requirement of the narrow standard. That same requirement seems adequate to protect against admissions entitled to protection. If the attorney's statement is based upon a fact communicated by the client, its use as an admission is barred by the availability of the privilege, even under the narrow standard. If the attorney makes an admission as agent for his client, without revealing a fact confidentially communicated from the client, no reason appears why such admission should be protected.[2] Thus, Wigmore's reasons for adopting the broad standard are adequately satisfied by the narrow standard.

■ Whether the *Georgia-Pacific* qualification should be adopted is a closer question. Extending the privilege to communications from the attorney that "might" reveal client confidences reverses the normal approach that places the burden of establishing entitlement to the privilege on the client who claims it. On the other hand it does serve the purpose of the privilege by

---

**2.** The discussion in the Wigmore treatise concerning the need to prevent the use of the attorney's statements as admissions of the client refers the reader to § 1071, which concerns adoption by silence of statements made in one's presence. That situation too is adequately protected by the narrow standard. If an attorney's advice were admissible only because it had been tacitly adopted by the client, the tacit approval (equivalent to a spoken approval) is a confidential communication from the client to the attorney that would be revealed by the attempt to make the attorney's advice admissible. If the attorney's advice is admissible without adoption by the client, or, as in discovery, is useful to the adverse party without regard to whether it was adopted by the client, there is no reason to consider it privileged.

maintaining a client's ability to confide fully in his attorney. Without the protection for attorney communications that arguably contain client confidences, clients might be inhibited from confiding in their attorneys for fear that they might not be able to demonstrate that the attorney's communication was in fact based on their communication to him. The risk of such inhibition is virtually removed by holding the privilege unavailable when the attorney's communication is demonstrably based on facts that did not come from the client in confidence.

■ 2. A second issue is whether the attorney's advice is privileged only when communicated to the client or whenever expressed in confidence, such as in a memorandum to his own file. *Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451, 461 (1947), provides at least the basic answer when it states: "Nor does this privilege concern the memoranda, briefs, communications and other writings prepared by counsel for his own use in prosecuting his client's case; and it is equally unrelated to writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories." Accord *Natta v. Zletz*, 418 F.2d 633, 637–38 (1969); see also *Dura Corp. v. Milwaukee Hydraulic Products, Inc.*, 37 F.R.D. 470, 473 (E.D.Wis.1965).

Of course, the attorney's opinions and legal theories, even if recorded in his own files, are privileged under the narrow standard of *United Shoe* if they reveal information supplied in confidence by the client. But absent such information from the client, it is only the work product rule and not the privilege that protects the attorney's uncommunicated expression of opinion.

3. A third issue concerns the role of in-house patent counsel. Judge Wyzanski observed in *United Shoe* that in view of the usual duties of a person in a corporate patent department, the relationship of such a person to the corporation is "not that of attorney and client." 89 F.Supp. at 361. Significantly he illustrates the non-privileged activity of such a person with the example of spending time on "questions . . . of the scope of public patents . . . ." *Id.* at 360. Subsequent cases have somewhat refined the broad statements in *United Shoe* by regarding the communications of in-house patent counsel as privileged or not, depending on what the attorney is doing in the particular communication being examined. *Jack Winter, Inc. v. Koratron Co.*, 50 F.R.D. 225 (N.D.Cal. 1970); *Chore-Time Equip., Inc. v. Big Dutchman, Inc.*, 255 F.Supp. 1020 (W.D. Mich.1966); *American Cyanamid Co. v. Hercules Powder Co., supra; Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792, 794 (D.Del.1954) (no privilege when concern is with "scope of public patents"). The privilege is not available when the communication from in-house patent counsel does not apply rules of law to confidential communications received from the client, *Paper Coverting Machine Co. v. FMC Corp.*, 215 F.Supp. 249, 252 (E.D.Wis.1963), but this is because that type of communication is not privileged, not because the person transmitting it is (a) in-house, (b) a patent lawyer, or (c) doing what some might regard as nonlegal work.

■ In some situations the statements of in-house patent counsel might appropriately be viewed as privileged statements of the client.[3] This could occur, for example, if patent counsel assembled a list of patents owned by his company but not, in his opinion, being used, and sent that list to the general counsel or outside counsel with a request for advice as to whether the retention of the unused patents created risk of

---

**3.** This appears to be the view expressed in *Dura Corp. v. Milwaukee Hydraulic Products, Inc., supra,* in which in-house patent counsel is described as "an employee of the [corporation] serving at its patent counsel." *Id.* at 472. Communications between him and outside counsel were accorded the privilege, though communications between the same outside counsel and the corporation's associate counsel were considered outside the privilege because they were not communications between attorney and client. *See also Duplan Corp. v. Deering Milliken, Inc., supra* at 1167; *Georgia-Pacific Plywood Co. v. United States Plywood Corp., supra* at 464.

antitrust liability. While the patents are public, the patent attorney's opinion as to their non-use adds a nonpublic ingredient, which if communicated in confidence to seek legal advice might well be entitled to protection.

■■■ From this discussion it is apparent that the documents in issue are not entitled to protection. They do not reveal facts communicated by the client in confidence. To the extent they may express legal opinions, these concern the scope of public patents. It does not even appear that the documents were communicated to the client; however, even if routine transmission of information copies to the general counsel's office could be considered communication with the client, the "communication" is still not privileged since it demonstrably reveals no confidences of the client. Finally, there is no indication that in-house patent counsel were seeking anyone's legal advice concerning the contents of these documents. Indeed, Xerox's contention is that patent counsel were giving, not receiving, legal advice. With the attorney-client privilege not available to protect these documents, they are properly discoverable, the work product protection having been accorded in Pre-Trial Ruling No. 17 only to those documents prepared with an eye to litigation.[4]

## II.

Xerox also seeks reconsideration of the ruling that there was not a sufficient showing of a shared exposure of Xerox and The Rank Organisation to antitrust liability during Xerox-Rank negotiations to justify considering the legal advice given to Xerox officials in the presence of Rank officials as sufficiently confidential to remain privileged. To bolster its claim, Xerox has now taken the somewhat unusual step of submitting *ex parte* for the Court's *in camera* inspection an affidavit from counsel for

Rank, purporting to demonstrate the substantiality of the risk of shared exposure.

SCM strenuously objects to the *ex parte* submission. This is not a situation where a court directs allegedly privileged matter to be submitted for *in camera* inspection so that a determination can be made from the contents as to whether the privilege applies. Here Xerox is seeking to establish circumstances to demonstrate that deposition questions need not be answered because they call for allegedly privileged answers. Furthermore, SCM contends there is simply no reason why Xerox should be permitted to relitigate the point with a late submission that could have been produced before. Without doubting that there is considerable force to both objections, I prefer to rest decision on the unpersuasiveness of the affidavit itself.

The affidavit was executed by Rank counsel and obtained by Xerox counsel for use in litigation. It seems reasonable to assume it was worded with some care, and that the representations go as far toward advancing Xerox's position as the oath would permit. While there is a conclusory reference to "the possibility of shared exposure to antitrust attack or liability," there is simply no sufficient basis for a finding that Rank and Xerox were jointly interested in the legal advice Xerox counsel gave during the course of arm's length negotiation between the two entities. The affidavit significantly omits any indication that Rank counsel ever suggested to his client the possibility of shared exposure to antitrust liability. Rank counsel refers to his own assessment that there "might" be a challenge and that a challenge "could" involve Rank. This assessment, he says, was communicated to Xerox representatives, together with his view that there was no antitrust violation.

■■■ Of course there need not be a clear demonstration of actual liability before a third party and a client can be considered to

---

4. In order to avoid possible misunderstandings concerning document identification, it should be noted that the reference to PS 90299 in Pre-Trial Ruling No. 17 n.4 should have been to PS 90295 *et seq.* Further, the documents identified by Xerox as PS 91130 actually begin with the designation PS 91330.

have a sufficiently common interest in legal advice. And the prospect of liability need not arise solely in the context of trial preparation. But a client's sharing of its attorney's advice with a third party is not in confidence simply because the third party's lawyer thought that there "might" be a challenge, which "could" involve his client. Unless the interests of the parties are demonstrably common, as when potential defendants discuss grand jury questioning, *Continental Oil Co. v. United States,* 330 F.2d 347 (9th Cir. 1964), or intended pleas, *Hunydee v. United States,* 355 F.2d 183 (9th Cir. 1965), the risk of shared exposure must at least be sufficiently substantial to have prompted the third party's lawyer to counsel his client regarding the prospective hazard.

▮ The conclusory statements contained in the affidavit do not dispel the view that Xerox wanted to change the arrangement, without any serious concern about potential liability of Rank. As the Xerox president acknowledged at his disposition, the meetings and statements discussed "legal considerations affecting Xerox." McColough Deposition, Tr. 2251–52 (May 1, 1975). What Xerox has failed to demonstrate is that when its personnel discussed legal advice they had received with personnel of Rank, the Xerox personnel had any reasonable basis for assuming that the advice was of such common interest to Rank or sufficiently concerned the risk of Rank's shared exposure to liability as would make the advice privileged from subsequent disclosure. Advice discussed with a negotiating adversary in the absence of circumstances supporting such a reasonable expectation is not entitled to protection.

### III.

Xerox requests reconsideration of the ruling requiring it to answer Interrogatory No. 62(a), which requests identification (by inventor, number, and date and country of issue) of each patent ever used in plain paper office copiers and duplicators manufactured or marketed by Xerox at any time. Pre-Trial Ruling No. 17 required Xerox to answer that Interrogatory as to all models that bore a legend either listing the patents used or representing that such a list would be furnished upon request. Citing other language in the Ruling that declined, partly because of undue burden, to order Xerox to formulate claims as to patent coverage for machines that did not bear such a legend, Xerox contends the Court must have intended to require an answer to Interrogatory No. 62(a) only to the extent that opinions as to coverage are already in existence. Xerox is correct in suggesting that the Court did not expect that response to Interrogatory No. 62(a), to the extent allowed, would entail much of a burden. The Court assumed that when Xerox represented to the public that a list of patents would be furnished upon request, there must exist some documents that would have enabled Xerox to respond to such an inquiry with reasonable promptness. It is hard to believe that Xerox would have answered a request by saying, "We have documents that list some patents being used, but it will be an enormous burden for our patent department to complete the analysis necessary to list all the patents being used."

Nevertheless Xerox asserts that in fact the available documents do not list all of the patents used on machines that bore the legend promising to furnish such information. No claim is made that such documents formerly existed but have since been destroyed. Nor has Xerox contended that it lacked the ability to furnish to consumers the list of patents it represented it would supply. It may well be that no single document contains a list of patents used in each machine. However, unless the Xerox representation to the public was misleading, Xerox must have some material in its files from which the requested lists can be assembled.

Xerox's own internal documents submitted to the Court and ordered produced under Pre-Trial Ruling No. 17 reveal that this is not the first time Xerox has sought to place obstacles in the way of those who simply ask it to honor the public representation it has made. In January, 1967, a re-

quest was made for patents used in three machines. Xerox responded with a list of all patents owned by Xerox Corporation. Undaunted by the overkill, the inquiry was renewed, with the request limited to patents used in a single machine. That letter went unanswered. A renewed request in April evoked a reply in May, which stated: "We did sent to you a list of certain of our patents, and I am afraid I cannot tell what additional specific information you need." In June the persevering requester reminded Xerox that his inquiry concerned only the patents covering the Model 914, charitably suggesting that the complete list of all patents had been sent inadvertently. That letter was circulated internally for guidance with the notation "We *do* have a list of 914 patents which we *don't* ordinarily send out." (Emphasis in original). Ultimately wiser heads prevailed, and the January request was complied with on August 1. Two years later a request for patents relating to another machine evoked a different tactic. Though an internal document had identified 14 unexpired patents that "probably" related to the machine, the requester was sent six patents with this explanation: "We are enclosing some typical patents which outline our processes . . . ."

The Court does not expect that Xerox patent personnel will now begin an analysis of every patent and make discrete judgments as to whether or not they read on every machine. Much of the required listing is already reflected in the documents already ordered to be produced. As to many patents, it must be readily ascertainable that they do not apply to any machines. If bona fide doubt exists whether some patents are used in a particular machine, the interrogatory response can forego definitive answers in favor of an indication of probable coverage. Abuse of this limited leeway will encounter sanctions.

Except to the extent modified in the prior paragraph, the motion to reconsider Pre-Trial Ruling No. 17 is denied. Documents ordered to be produced by that Ruling shall be given to SCM by March 15. Interrogatory responses, and *in camera* submissions required by that Ruling shall be filed by March 31.