**HYDRAFLOW, INC., Plaintiff,**

v.

**ENIDINE INCORPORATED, Defendant.**

**No. 88–CV–1120S.**

United States District Court,
W.D. New York.

Feb. 19, 1993.

Beehler & Pavitt (Bruce A. Jagger, of counsel), Culver City, CA, Sommer, Oliverio & Sommer (Daniel C. Oliverio, of counsel), Buffalo, NY, for plaintiff.

Hodgson, Russ, Andrews, Woods & Goodyear (Paul I. Perlman, of counsel), Robert A. Lane, Sr., Buffalo, NY, for defendant.

## DECISION AND ORDER

FOSCHIO, United States Magistrate Judge.

## JURISDICTION

This matter was referred to the undersigned by the Hon. William M. Skretny on December 16, 1991 for determination of any non-dispositive motions. Presently before the court is Defendant's motion to compel discovery and production of certain documents pursuant to Fed.R.Civ.P. 37(a).

## BACKGROUND

Plaintiff has alleged that Defendant is infringing its patent on its invention of a "snubber" issued on December 28, 1976. The instant motion, filed by Defendant on April 29, 1992, sought an *in camera* review and subsequent production of fourteen documents which Plaintiff claims are not discoverable based on the attorney-client privilege. Defendant also sought certain specified documents, responsive to its document request, bearing a date subsequent to January 1, 1989.[1]

By Decision and Order, dated September 9, 1992, this court directed that the disputed documents be delivered to the court for an *in camera* review as part of its determination of any possible bar to disclosure based on the privilege. The court also denied Defendant's motion to compel disclosure of the post-January 1, 1989 documents based on the Plaintiff's representation that all such documents have been disclosed.

In accordance with the court's order, on September 21, 1992, copies of the documents were delivered to the court, together with a Declaration by Plaintiff's outside patent attorney, Bruce A. Jagger, ("Declaration") summarizing the nature of each disputed document and explaining the basis for Plaintiff's belief that each document was covered by the privilege. The copies of the disputed documents were physically appended to the Declaration along with photocopies of certain decisions offered in support of Plaintiff's position.

On October 9, 1992, Defendant's counsel filed an affidavit objecting to the Declaration as it included legal argument contrary to the court's direction and, further, that as copies of the documents in question were also delivered to him as part of the Declaration, Plaintiff had thereby waived any privilege as to the documents.

On October 13, 1992, Plaintiff's local counsel, Sommer, Oliverio & Sommer, filed an affidavit in which it advised the court that service of the Declaration together with copies of the documents had in fact been delivered to Defendant's counsel by their office, but that their inclusion with the Declaration was "inadvertent" and without any intention to waive the alleged confidentiality or privileged nature of the documents. The affidavit also represented that local counsel had discussed the matter with Mr. Jagger and that the disclosure to Defendant's attorneys was not intended by either he or Mr. Jagger but, rather, resulted from "honest and inadvertent confusion" by local counsel's office staff "concerning the documents to be served upon the court and upon opposing counsel."

Counsel also pointed to the provision in paragraph 17 of a Protective Order entered by Magistrate Judge E.J. Maxwell of this court on February 11, 1991 which states in pertinent part that "[a] party's *inadvertent* production of documents in this action for

---

1. As discussed *infra* at pp. 634 to 636, there are actually only twelve individual documents in dispute. In the interest of completeness, Plaintiff submitted copies of four of the documents as these carried common variations such as date stamps. However, whereas Plaintiff's objection lists fourteen documents, see Hydraflow's Response to Enidine's First Document Request at p. 3, the Jagger Declaration described *infra* also included an extra copy of two letters—September 11, 1975 and January 11, 1977—for a total of sixteen submitted documents.

another party's inspection or copying shall not in itself be deemed to waive any claim of attorney-client privilege, ... with respect to such document or other documents or communications, written or oral ..." (emphasis added). For these reasons, Plaintiff demanded return of the documents and an order prohibiting use of the documents pending the court's decision on the merits of the Defendant's motion to compel.

As the court concludes that certain of the disputed documents are within the attorney-client privilege and that, as to all the documents, the disclosures by Plaintiff to Defendant's counsel were inadvertent and do not constitute a waiver of any privilege in the documents as determined by this decision, Defendant's motion to compel is GRANTED, in part and DENIED, in part.

## DISCUSSION

### I.

To properly resolve the issues presented, it is first necessary to determine which of the documents or communications in question are in fact within the attorney-client privilege. See, Fed.R.Evid. 501. If determined to be within the privilege, it is then necessary to determine whether, as to the material in question, the privilege has been waived and the extent of such waiver. See, *In re Grand Jury Investigation,* 142 F.R.D. 276, 278 (M.D.N.C.1992).

 The attorney-client privilege requires that the asserted holder of the privilege is or sought to become a client, and that the person to whom the communication was made is an attorney admitted to practice and the communication was made while that person was acting as an attorney. The communication must also relate to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing primarily an opinion of law or legal services or assistance in a legal proceeding. The privilege may not be asserted if the communication is for the purpose of committing a crime or tortious misconduct. Further, to be enforceable the privilege must

be claimed by the client, and not waived by the client. See, *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–60 (D.Mass.1950) (Wyzanski, J.) (communications from or to corporate patent department to or from counsel held within privilege). The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Whether a client's communication to an attorney is confidential depends on the existence of a subjective intention on the part of the client that the attorney keep the communication confidential. *Knogo Corp. v. United States,* 213 U.S.P.Q. 936, 938 (Ct.Cl.1980); *In re Grand Jury Subpoena,* 391 F.Supp. 1029, 1033–34 (S.D.N.Y.1975). There must be "some expectation" of confidentiality. *Knogo, supra,* at 939. In the case of the patent application process, such an intention is not negated by the fact that the information contained in the communication from a client to patent counsel, which is not protected by the privilege, has its source in the public domain. See, *In re Ampicillin Anti–Trust Litigation,* 81 F.R.D. 377, 389–90 (D.D.C.1978); *Knogo, supra.* If the primary purpose of the communication was to receive legal advice or services, inclusion of scientific or technical information will not displace the privilege. See, *Cuno, Inc. v. Pall Corp.,* 121 F.R.D. 198, 201 (E.D.N.Y.1988); *Eutectic Corporation v. Metco, Inc.,* 61 F.R.D. 35, 41 (E.D.N.Y.1973); *United States v. United Shoe Machinery Corp., supra,* at 359.

 Communications from an attorney to a client may also fall within the privilege if to disclose them would directly or indirectly reveal the substance of a confidential communication by the client and if it was considered to be confidential by the client. *Upjohn, supra,* 449 U.S. at 401, 101 S.Ct. at 688; *American Standard, Inc. v. Pfizer, Inc.,* 828 F.2d 734, 745 (Fed.Cir. 1987); *Standard Chartered Bank, plc v. Ayala International Holdings,* 111 F.R.D.

76, 79 (S.D.N.Y.1986). Further, the privilege only applies if the lawyer is providing legal advice or services and will not protect disclosure of non-legal communications where the attorney acts as a business or economic advisor. See, *Standard Chartered Bank, supra,* at 80. Where, however, there is a clear intention that the document, such as a business proposal, communicated to counsel is to be provided to a third party, the privilege is rendered inapplicable as the document is not intended to be confidential. See, *United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.1958).

In this case, Plaintiff asserts all the documents which have been submitted to the court for *in camera* review are privileged and argues that any confidential communication to counsel in support of or related to Plaintiff's snubber patent application is within the privilege, relying principally on *In re Ampicillin, supra* and *Knogo, supra.* Defendant contends there is no privilege as the information contained within the document is scientific or technical in nature or transmitted for inclusion with the patent application and, therefore, is not entitled to the privilege, relying on *American Standard, Inc. v. Pfizer, Inc.,* 828 F.2d 734 (Fed.Cir.1987).

There are conflicting decisions on whether, in the context of patent infringement matters, client communications to a patent attorney, or from a patent attorney to a client of essentially technical information and explanations relating to the operation or method of an invention are within the privilege. Those decisions applying the privilege subscribe to the view that matters communicated in confidence to an attorney in support of a patent application, if intended as confidential, are entitled to protection regardless of their technical content. The opposite holdings proceed from the position that if a patent is issued, such information may necessarily be disclosed to the United States Patent and Trademark Office ("Patent Office"), and, pursuant to 37 C.F.R. § 1.11(a), will become part of the public record associated with the required disclosures prerequisite to granting the patent, thereby negating any intent that the information remain confidential. Compare,

*FMC Corporation v. Old Dominion Brush Company,* 229 U.S.P.Q. 150, 1985 WL 5983 (W:D.Mo.1985) (where privilege applied patent attorney held not to be a mere conduit of client provided technical information for filing with Patent Office) with *Amsted Industries, Inc. v. National Castings,* 1990 WL 103286 (N.D.Ill.1990) (transmission of technical information for possible patent application not within privilege).

Those decisions denying the privilege to client to attorney communications which primarily contain technical information or facts relating to a patent application appear grounded on the analysis that, in the context of the patent application process, a patent attorney is merely a "conduit" or "waystation" for the transmission of such information to the Patent Office as part of the application process. See, *Amsted Industries, Inc., supra,* at p. 2 (privilege denied as to documents "transmitting technical information for patent application" absent a suggestion of a request for legal advice); *Detection Systems, Inc. v. Pittway,* 96 F.R.D. 152, 155 (W.D.N.Y.1982) (technical information not "calling for" legal opinion or interpretations, but intended primarily as an aid in completing patent applications are not privileged). However, such analysis tends to blur that aspect of the privilege which applies to the communication with the generally accepted limitation that the facts or information conveyed by the communication are not protected from disclosure. See, *e.g., Weil Ceramics & Glass, Inc. v. Work,* 110 F.R.D. 500, 504 (E.D.N.Y.1986) (communication to attorney as conduit for information eventually lodged with Patent Office not confidential). Also, contrary to the view expressed in some holdings which limit the duty in patent matters, it is not the case that the patent counsel has a duty to communicate all information received from a client to the Patent Office or that the privilege covers all communications from a client. See, *Natta v. Hogan,* 392 F.2d 686, 691 (10th Cir.1968). Rather, only material information, *i.e.,* information a reasonable examiner would consider important in deciding

whether to allow the application to issue, as distinguished from the communication itself, need be disclosed. See, 37 C.F.R. § 1.56(a) and (b).

 While the privilege "is an obstacle to the investigation of the truth" and should, therefore, be "confined to its narrowest possible limits," (see, *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.1973) (Friendly, J.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *Cuno, Inc. v. Pall Corp., supra*, at 200), neither should it be applied so as to chill the flow of candid information between client and attorney, defeating the proper and "salutory purpose" the privilege is designed to achieve within an adversary system of justice. See, *Upjohn, supra*, 449 U.S. at 389, 101 S.Ct. at 682; *United States v. Tellier, supra*, at 452 (Lumbard, J. dissenting). It is true that initial patent applications are not inherently adversarial, however, neither are the myriad daily contacts between clients and their attorneys in obtaining legal advice and services. Nevertheless, many of these matters, including patent applications, inevitably become the subject of substantial litigation. See, *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 116 F.R.D. 533 (N.D.Cal.1987) (reply to patent examiner held privileged despite reference to published prior art). Hence, the same considerations which justify applying the privilege to the typical communications between clients and their attorneys also warrant that the privilege be applied appropriately to the exchanges between clients and patent counsel incident to the patent application process.

 In *Hewlett–Packard*, the court stated that, in determining whether documents generated in connection with *ex parte* proceedings before the Patent Office were within the privilege, courts "should engage in a situation-specific analysis that is sensitive to the competing interests that are involved." *Hewlett–Packard, supra*, at 543. The "critical issue is not whether the information is purely technical or whether it finds its way into a patent application, but whether the communication was made in confidence to the attorneys."

*Cuno, Inc., supra*, at 202. The court in *Natta* correctly observed that much of prelitigation information routinely and privately communicated in confidence to counsel, is ultimately expressed in a publicly disclosed complaint, however, no one would suggest that the client's communications with counsel were thereby not privileged or that the privilege was waived. See, *Natta, supra*, at 691. Nor is it not essential that the document contain an express request for a legal opinion. *Knogo Corp. v. United States, supra*, at 941–942 n. 8. Rather, it is sufficient if the document contains the "usual interchange which occurs between an inventor and his patent attorney," in connection with a patent application. *Knogo, supra*.

The representation by patent counsel of an inventor in patent matters is a recognized form of the practice of law entitled to application of the attorney-client privilege undiluted by the notion that as highly technical subject matter is involved, the privilege would not serve its traditional purposes of preserving confidential matters. In *Sperry v. Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), the Supreme Court expressly held that the "preparation and prosecution of patent applications for others constitutes the practice of law." *Sperry, supra*, at 382, 83 S.Ct. at 1324. The Court in *Upjohn* stated that the privilege "recognizes that sound legal advice or advocacy . . . depends upon the lawyer being fully informed by the client." *Upjohn, supra*, 449 U.S. at 389, 101 S.Ct. at 682. That this form of law practice by its nature involves the ability to deal in scientific subject matter with legal and technical precision was well stated by the court in *Cuno:*

> The domain of the patent lawyer is a highly technical one. The determination of whether an invention is new, useful and unobvious necessarily requires an analysis of the technical aspects of the invention, which in turn must be compared to the technical aspects of the prior art.

*Cuno, Inc., supra*, at 202.

In *Sperry*, the Court, in describing the traditional lawyering activity performed by patent counsel, stated that:

"[s]uch conduct inevitably requires the practitioner to consider and advise his clients as to the patentability of their inventions under the statutory criteria ... as well as to consider the advisability of relying upon alternative forms of protection which may be available under state law. It also involves his participation in the drafting of the specifications and claims of the patent application ... which this court long ago noted 'constitute[s] one of the most difficult legal instruments to draw with accuracy,' ... and upon rejection of the application, the practitioner may also assist in the preparation of amendments ... which frequently requires written argument to establish the patentability of the claimed invention under the applicable rules of law and in light of the prior art."

*Sperry, supra*, 373 U.S. at 383, 83 S.Ct. at 1325 (citations omitted).

Contrary to the notion that a patent attorney simply 'funnels' documents and information prepared by the client to the Patent Office, which the court in *Knogo* described as an "uninformed characterization," (*Knogo, supra*, at 940), the interaction between client and patent counsel in the prosecution of a patent application, as appears from the above description by the Supreme Court, involves numerous professional judgments and actions requiring skill and well-informed professional legal advice and service necessarily depending on full and candid interchanges between client and patent counsel. It is evident, therefore, that communications between inventors and patent counsel relating to patent applications may qualify for protection within the privilege as the patent application process itself constitutes a legal proceeding and the services to be provided by the patent attorney incident thereto clearly are legal in nature. See, *Knogo, supra; United Shoe Machinery Corp., supra.*

While it may be said that the application, signed and sworn to by the client, is a document intended to be filed in the Patent Office by the attorney on behalf of the client, and therefore not subject to the privilege as it is intended for reliance and scrutiny by third-parties and not solely for counsel's eyes, "the same cannot be said about technical communications which preceded the patent application." *Knogo, supra*, at 940–41. Accord, *FMC Corporation v. Old Dominion Brush Co.*, 1985 WL 5983 (W.D.Mo.1985). As pointed out above, by Patent Office regulation the application only becomes a public record if the patent is issued. This fact is consistent with other patent regulations, (see, 37 C.F.R. § 1.14), that are intended to preserve the confidentiality of the application and any trade secrets in the submitted invention should the patent, which requires public disclosure of its declarations of new art in return for the monopoly of exploitation, be denied. See also, 35 U.S.C. § 122. Moreover, as specifically noted by the Court in *Sperry*, patent counsel's role necessarily includes the obligation to advise the client of alternative forms of protection, such as trade secrets, available under state law. *Sperry, supra*, 373 U.S. at 383, 83 S.Ct. at 1325.

■ Although the privilege is available to communications between client and patent counsel, it is also well established that the privilege does not prevent disclosure of the facts or information contained in the communication. See, *Upjohn, supra*, 449 U.S. at 395–96, 101 S.Ct. at 685–86; *In re Ampicillin, supra*, at 389 ("the privilege should protect only the client's communications to the attorney and not *facts* or *other information* contained in the communication") (emphasis added). Nor is the communication outside the privilege simply because the facts or information conveyed are known or may by other means become known to others. As the court in *Ampicillin* observed:

If an attorney-client communication could be discovered if it contained information known to others, then it would be the rare communication that would be protected and, in turn, it would be the rare client who would freely communicate to an attorney.

*In re Ampicillin, supra*, at 390.

■ The determinative factor is whether the client intends the communica-

tion to be confidential and therefore privileged or whether, if there is an intent to disclose the communication to others (or if the client permits or directs the attorney to do so), there can be no confidentiality. See, *United States v. Tellier, supra; In re Ampicillin, supra,* at 380–81 ("it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence"). The burden of establishing that such confidence was intended and has been maintained, and that the privilege is applicable is on the party who asserts it. *In re Horowitz, supra,* at 82.

Thus, in patent related litigation, the objective of full disclosure through discovery may be achieved, despite application of the privilege to communications even if primarily of a technical nature, as it is clear that the party seeking discovery is not thereby prevented from learning the facts by questioning a client or his representative as to how the invention works. See, *Knogo, supra,* at 940. By necessary extension, the same may be said of questions regarding how to make or use the invention. The opportunity for disclosure is furthered, in this case, as since the patent was issued, the patent file would also be a public record, and there could be no claim of confidentiality as a trade secret.

The decision in *American Standard, Inc. v. Pfizer, Inc.,* 828 F.2d 734 (Fed.Cir. 1987), relied upon by Defendant, is consistent with the position that communications between attorney and client transmitting technical information which may ultimately form part of the public record as to an issued patent are not for that reason beyond the proper scope of the privilege. In *American Standard,* the court affirmed the district court's determination that, because outside patent counsel's opinion letter relied upon nonconfidential information (presumably prior art as disclosed in Patent Office patent application files for issued and related patents obtained from public records), the document was not privileged. The Court of Appeals' actual holding, however, was that, as the disputed legal opinion did not reveal any confidential communication of the client, there was no privi-

lege and, therefore, no waiver had occurred based on the disclosure of the document to the plaintiff. This analysis is in accord with the general rule, discussed above, that the privilege extends to communications of the attorney to a client if they reveal a client confidence. The court took care to limit its decision by stating that patent validity opinions based on publicly available information are not "for that reason alone outside the privilege." *American Standard, supra,* at 746.

Proper application of the privilege to permit discovery of the facts or information which are the subject of a confidential communication does not render enforcement of the privilege meaningless. Both *Sperry* and *Upjohn,* make clear that the privilege should, nevertheless, be applied to confidential communications for the benefit of clients, attorneys and the judicial system. As reiterated by the Court in *Upjohn,* the privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences *or the apprehension* of disclosure." *Upjohn, supra,* 449 U.S. at 389, 101 S.Ct. at 682, quoting *Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888) (emphasis added).

 Applying these principles to the correspondence at issue yields the following conclusions. The January 30, 1975 letter from Plaintiff's outside patent attorney, Mr. Jagger, to the law firm of Bacon & Thomas, Washington, D.C. based patent attorneys, requested an accelerated patent search report regarding the proposed snubber patent. This document does not appear to contain nor directly or indirectly disclose any confidential communications from Hydraflow, Jagger's client. Accordingly, it is not within the privilege, and is subject to discovery in the instant action.

The letter of February 5, 1975 from Bacon & Thomas to Mr. Jagger described five patents resulting from their patent search. It summarized each patent and proposed, in

the interest of completeness, an expanded search to cover three other patent classes, together with a brief rationale and cost projection, and enclosed copies of two described patents. There is no indication it was intended to be confidential, and as it does not disclose any client confidences it also is not privileged and, therefore, should be disclosed.

The February 11, 1975 letter from Mr. Jagger to Hydraflow transmitted, without comment, the four patents referred to in the Bacon & Thomas correspondence described above and as such is not privileged. See, *Detection Systems, Inc., supra,* at 155 ("transmittal letters which are devoid of legal advice and disclosed nothing which could be considered privileged" held not privileged).

The March 19, 1975 letter from Mr. Ullrich of Hydraflow to Mr. Jagger is a detailed discussion of the key physical and operational elements of the snubber in relation to the four patents transmitted from counsel for Hydraflow's review. It is clearly intended to assist counsel in preparing an application to the Patent Office for the snubber invention by explaining how the various design problems were successfully addressed by the invention in distinction to the earlier patents, and concludes that the application process should go forward. As such, it constitutes a specific request for legal assistance and service in connection with a patent application before the Patent Office, a legal proceeding, and is a typical interchange between a client and patent counsel to enable counsel to provide the requested professional legal assistance. No third parties were copied, and there is no indication its contents are to be explicitly transmitted to any third parties. Both its contents and the circumstances of its creation demonstrate it was intended as a confidential communication to patent counsel and, accordingly, it is within the privilege.

The September 11, 1975 letter from the snubber's inventor, George Mahoff of Hydraflow, to Mr. Jagger referenced the docketed snubber patent application and provides several views, or drawings, of certain aspects of the invention. It also advised that a sample of the snubber was being provided under separate cover. A discussion and explanation of those elements of the invention as portrayed in the drawings was also provided. Again, no third persons were copied, nor was there any suggestion that the communication itself was to be submitted to the patent examiner, and, as the letter is typical of the correspondence between client and patent attorney in connection with the preparation of a patent application, it constitutes a confidential communication intended to assist counsel in providing legal services; it is, therefore, also privileged.

An October 17, 1975 letter to Jagger from Mahoff transmitted the patent application and an executed assignment. As such, and as discussed above in reference to the February 11, 1975 correspondence, it is not privileged.

On November 17, 1975, Jagger wrote to Ullrich of Hydraflow and advised that the patent application had been filed and described typical time frames relative to future action by the Patent Office on the application. It also outlined the opportunities for foreign patent registrations and requested instructions as to that optional form of additional protection. There were no copies to any third parties. While the reference to the option of foreign registrations raises a question of whether legal advice had been sought by Hydraflow on this subject, on balance the letter appears primarily intended as a transmittal document with the reference to foreign registration possibilities being standard information routinely provided without regard to any aspects peculiar to the client's application. As such, it does not divulge a client confidence and is, therefore, not privileged and should be disclosed.

The March 12, 1976 letter from Mr. Jagger to Mr. Ullrich of Hydraflow transmits a copy of a Patent Office action and asks for assistance from the client in responding to the requests from the patent examiner as contained in the action for clarification of certain references in the application. The letter also sets a deadline for the

client's response. As a request for information by the client's attorney and a transmittal letter, it does not disclose any confidential information and is not privileged.

The May 12, 1976 letter from Mahoff to Jagger dealt directly with rejections by the patent examiner of certain of Hydraflow's claims contained within the application. It discussed the perceived technical reasons for the rejections and provided further technical explanations so as to enable Jagger to attempt to overcome the rejections. No third parties were copied and there is no indication it was to be forwarded to the examiner or others. In addition to the considerations discussed above as to the March 19, 1975 and September 11, 1975 letters, this document also is couched in terms of a strategy or an approach to the task of persuading the patent examiner to admit the claims, suggested by the client. Accordingly, its apparent purpose and the circumstances of its creation strongly suggest that, as it was generated to assist counsel in providing legal services, it was intended to be confidential. See, *Hewlett–Packard, supra,* at 543. Accordingly, it is also within the privilege.

The August 6, 1976 letter from Jagger to Ullrich advised that Hydraflow's claims have been allowed, enclosed a letter of advice from the Patent Office and indicated the formal patent would be issued in due course. As the document appears to be essentially a transmittal letter, it is not privileged.

On September 20, 1976, Mr. Jagger's partner, G.W. Arant, wrote to Hydraflow, advised the patent had been formally allowed and provided instructions concerning routine filing fees and printing costs associated with the issuance of the patent. The letter also offered general advice regarding possible foreign patent application. As the document does not appear to reveal any possible client confidences, it is also not privileged.

Similarly, on January 12, 1977, Jagger transmitted to Ullrich the original snubber patent together with advice as to proper legending requirements necessary to assert the patent in connection with Hydraflow's products. No third parties were copied. Although the essential purpose appears to be a transmittal letter, it is unclear whether the communication is in actuality a response to a request from the client for specific legal advice on how to comply with the legending requirements for Hydraflow's products which may involve the snubber patent. However, according to the Declaration of Mr. Jagger (see Jagger Declaration dated September 17, 1992 at p. 5) the advice was in fact a response to an undisclosed confidential communication with Hydraflow. This being so, disclosure would breach the confidence and, accordingly, the document should be considered privileged.

## II.

■ While it is a general rule that the privilege is personal to the client and may be voluntarily waived only by action of the client, it is also clear that the client's attorney can be held to possess implied authority as an agent to effect a waiver whether voluntary or inadvertent. See, *In re Von Bulow,* 828 F.2d 94, 101 (2d Cir. 1987); *Standard Chartered Bank, plc v. Ayala International Holdings,* 111 F.R.D. 76, 85 (S.D.N.Y.1986) (inadvertent disclosure by attorney during discovery did not waive privilege); 1 McCormick on Evidence, § 93 at 341 (William D. Strong ed., 1992).

■ Recent decisions addressing the issue all impliedly conclude that, in the context of pre-trial discovery, an attorney's inadvertent disclosure of an otherwise privileged document may waive the privilege on behalf of the client. See, *In re Grand Jury Investigation,* 142 F.R.D. 276 (M.D.N.C.1992); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.,* 132 F.R.D. 204 (N.D.Ind.1990); *International Digital Systems Corporation v. Digital Equipment Corporation,* 120 F.R.D. 445 (D.Mass.1988); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46 (M.D.N.C.1987); *Standard Chartered Bank, supra; Lois Sportswear, U.S.A. Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103

(S.D.N.Y.1985); *Dunn Chemical Co. v. Sybron Corp.*, 1975 WL 970 (S.D.N.Y.1975). As it is ultimately the responsibility of the client to take adequate precautions to preserve the confidentiality of its records and communications, the failure to do so, whether occasioned by neglect of the client or counsel, is relevant to the question of the client's intent to maintain the confidential nature of communications claimed to be privileged. See, *In re Horowitz, supra,* at 82.

There are three distinct lines of federal judicial authority on the question of the effect of an inadvertent disclosure. See, *International Digital, supra,* (inadvertent disclosure always results in waiver as it is impossible to reverse the effect of negligent or intentional disclosure); *Connecticut Mutual Life Insurance Company v. Shields,* 18 F.R.D. 448 (S.D.N.Y.1955) (inadvertent disclosure by attorney cannot waive privilege absent a showing client intended to waive); *Parkway Gallery Furniture, supra,* (applying a balancing test using five factors). The intermediate approach, exemplified in *Parkway,* considers (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosure, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interests of justice would or would not be served by relieving the party of its error. See, *In re Grand Jury Investigation, supra,* at 278–79 (inadvertent disclosure may waive privilege where circumstances of disclosure reflect gross negligence or failure to take reasonable precautions). The degree to which the disclosed information has been allowed to "weave itself into the fabric" of pre-trial discovery so as to create reliance by the opponent is also an influencing factor. See, *In re Grand Jury, supra,* at 281 (no waiver where disclosed documents had not been shown to grand jury); *Golden Valley, supra,* at 209 (unchallenged use of inadvertently disclosed letter at deposition constituted waiver).

While the Second Circuit has not, to date, taken a position directly on this issue, it appears that the prevailing view at the district court level within the circuit more closely follows the intermediate position which considers a number of relevant factors. See, *Standard Chartered Bank, supra; Lois Sportswear, supra.* As the court in *Lois Sportswear* stated:

What is at issue here is whether or not the release of the documents was a knowing waiver or simply a mistake, immediately recognized and rectified. The elements which go into that determination include the reasonableness of the precautions to prevent inadvertent disclosure, the time taken to rectify the error, the scope of the discovery and the extent of the disclosure. There is, of course, an overreaching issue of fairness and the protection of an appropriate privilege which, of course, must be judged against the care or negligence with which the privilege is guarded with care and diligence or negligence and indifference.

*Lois Sportswear, supra,* at 105.

 The stringent approach exemplified and adopted by the decision in *International Digital, supra,* may well have logical appeal and a certain deterrent effect on litigation counsel, but it tends to sacrifice the value of protecting client confidences in the name of certainty of result. Similarly, a test for waiver which turns exclusively on the intention of the client, illustrated by the decision in *Connecticut Mutual Life Insurance, supra,* is "too extreme," (see, *Standard Chartered Bank, supra,* at 86), as every client would certainly deny any intention to waive. To the extent that fairness is also a value, the approach taken by federal courts in the more recent decisions within this circuit is, for that reason, preferred. See, 1 McCormick on Evidence, *supra,* at 343 (noting that the likelihood of high costs associated with enforcement of a strict rule and indicating the cases are "tending" in the "direction" of a fairness based test).

An example of an application of this approach, relevant to this case is *Data Systems of New Jersey v. Philips Business*

*Systems, Inc.*, No. 78 Civ. 6015, 1986 WL 733 (LEXIS, Genfed Library Dist. file) (S.D.N.Y. Jan. 8, 1986) which found that the inadvertent disclosure of a single privileged document as a result of an oversight by plaintiff's counsel's law firm did not constitute a waiver. The court determined that the assertion of privilege was not an afterthought, and that counsel raised the issue "as soon as the matter was brought to his attention." *Data Systems, supra*, at p. 7.

■ In the instant case, given the pendency of Defendant's motion to compel directed at the very documents in dispute, it was clearly understood that the requested documents were not intended to be turned over to the defense, but, rather, were to be delivered only to the court for an *in camera* inspection, in accordance with the court's order of September 9, 1992, incident to its consideration of Plaintiff's objection claiming a privilege in the documents. Although the September 9th order was not a formal protective order there should not have been any doubt as to Plaintiff's actual intention as to the confidentiality of the documents and, upon receipt of the mistakenly delivered documents, Defendant's counsel should have realized immediately the delivery was an obvious error. While asserting, perhaps understandably, that a waiver had occurred, Defendant's counsel promptly, and commendably, on October 9, 1992, informed the court and Plaintiff's counsel that the documents filed with the court on September 21, 1992 had also been delivered to his office. However, he did not offer to return them so as not to require further review of the issue by this court. Four days later, on October 13, 1992, Plaintiff's local counsel reasserted a privilege in the documents, denied any waiver has occurred, and demanded their return. It was also represented that his office staff inadvertently delivered the documents to defense counsel as part of the Jagger Declaration. Counsel also invoked the February 11, 1991 Protective Order which provides that an inadvertent disclosure of privileged material shall not be deemed as a waiver.

The court notes that both parties had also filed motions requesting protective orders as to depositions of their respective patent counsel which were decided by the court on January 12, 1993. The disputed documents were apparently intended for use in connection with the deposition of Plaintiff's counsel. As these depositions have not yet been conducted, it does not appear, nor has the court been advised, that any of the documents have become directly involved in the discovery process. Accordingly, there is no showing of any significant reliance on the documents by Defendant. Further, it is apparent that the documents were not negligently screened as part of the response to the Defendant's document request. Rather, in response to Defendant's document production request, they were specifically identified as privileged raised by specific objection in Plaintiff's response, and, for that very reason, became the subject of the instant motion to compel. Although it seems inexplicable that counsel would, through office failure, place at risk the potential loss of privilege in the documents at issue while the matter was under judicial advisement, nevertheless, upon the present record, it would work a fundamental unfairness to Plaintiff by depriving it of the benefit of the specific objection it interposed to vindicate the privileged status of the documents, absent any showing of countervailing unfairness to Defendant. Finally, although the Protective Order does not, by its terms, apply to the documents, paragraph 17 of the order strongly negates the inference that Plaintiff intended to waive the privilege. The court, therefore, concludes that the circumstances of the instant disclosure demonstrate it was inadvertent, and that such oversight by Plaintiff's counsel does not warrant imputing to Plaintiff an intention to waive its privilege in those documents to which the court has found the privilege applies.

Where, as here, inadvertent disclosures have been determined not to constitute a waiver, courts have directed that the documents be returned, and that they not be used in the subsequent course of the litigation. See, *In re Grand Jury Investigation, supra*, at 283; *Data Systems, supra*,

at p. 8; *Manufacturers & Traders Trust Co. v. Servotronics*, 132 A.D.2d 392, 522 N.Y.S.2d 999, 1004 (4th Dep't.1987).

For convenience, an appendix to this decision summarizes which of the documents are privileged or not privileged, and the reason for the court's determination.

### CONCLUSION

For the reasons discussed, Defendant's motion for production is, as to the documents found to be privileged, DENIED; as to such of the documents not privileged, the motion is GRANTED. Further, counsel for Defendant is directed to promptly return all privileged documents to Plaintiff, without retaining any copies, and to avoid making any use of such documents during the future course of this action.

SO ORDERED.

| | APPENDIX | |
|---|---|---|
| Document | Determination | Rationale |
| 1. Letter—Jagger to Bacon & Thomas dated 1/30/75 | Not Privileged | No client confidence disclosed |
| 2. Letter—Bacon & Thomas to Jagger dated 2/5/75 | Not Privileged | No intention to be confidential no confidence revealed |
| 3. Letter—Jagger to Hydraflow dated 2/11/75 | Not Privileged | Transmittal letter—no confidences disclosed |
| 4. Letter—Ullrich to Jagger dated 3/29/75 * | Privileged | Confidential request for legal assistance |
| 5. Letter—Mahoff to Jagger dated 9/11/75 * | Privileged | Confidential communications to counsel from client |
| 6. Letter—Jagger to Mahoff dated 10/17/75 * | Not Privileged | Transmittal Letter |
| 7. Letter—Jagger to Ullrich dated 11/17/75 | Not Privileged | Standard information; no client confidences disclosed |
| 8. Letter—Jagger to Ullrich dated 3/12/76 | Not Privileged | Request for information—no confidences revealed |
| 9. Letter—Mahoff to Jagger dated 5/12/76 | Privileged | Confidential communication from client regarding legal strategy and issues |
| 10. Letter—Jagger to Ullrich dated 8/6/76 | Not Privileged | Transmittal letter |
| 11. Letter—Arant to Hydraflow dated 9/20/76 | Not Privileged | Standard information— client confidences not revealed |
| 12. Letter—Jagger to Ullrich dated 1/12/76 * | Privileged | Confidential response to request for legal advice— would reveal client confidences |

* Two documents submitted