**UNITED STATES of America**

v.

**UNITED TECHNOLOGIES CORP.**

**No. 3:96–MC–10 (EBB).**

United States District Court,
D. Connecticut.

Aug. 14, 1997.

David J. Sheldon, Asst. U.S. Atty., New Haven, CT, John V. Cardone, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

Harold J. Heltzer, Crowell & Moring, Washington, DC, James Sicilian, Kara J. Lane, Day, Berry & Howard, Hartford, CT, for Defendant.

BURNS, Senior District Judge.

### RULING ON PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS AND RESPONDENT'S MOTIONS TO QUASH INTERNAL REVENUE SERVICE SUMMONS AND FOR RETURN OF PRIVILEGED DOCUMENT

The Internal Revenue Service (IRS) has brought this action pursuant to 26 U.S.C. §§ 7402(b) and 7604(a) to enforce a summons issued as part of an investigation of United Technologies Corp.'s (UTC's) tax liability for the years 1986–1989. UTC has moved the court to quash the summons on the grounds that the documents in question are protected by the attorney-client and work product privileges. It also seeks the return of an allegedly privileged document that it claims was disclosed by mistake. For the reasons stated below, the petition to enforce the summons and the motion to quash it are granted in part and denied in part, and the motion for the return of the document is granted.

## I. BACKGROUND

At the beginning of the 1980s, the General Electric Corp. dominated the market for small commercial jet engines. In an effort to break General Electric's market dominance, five other aerospace companies decided to form a consortium to produce a competing engine. The five members of the group were the Pratt & Whitney Division of UTC (Pratt); Rolls Royce, P.L.C. (Rolls) of the U.K.; Japanese Aero Engines Corp. (JAEC) of Japan; Motoren und Turbinen Union–München, GmbH (MTU) of Germany; and Fiat Aviazione, S.p.A. (Fiat) of Italy. In March 1983, the five companies signed a novel Collaboration Agreement (the Agreement) structuring their participation in the consortium. The Agreement set up a jointly owned company, International Aero Engines, A.G. (IAE) to design, test, produce, and market the V2500 jet engine.

In many respects, the March 1983 Agreement was not a final product, and it underwent numerous revisions. Nearly all the documents at issue here were produced as part of consultations and negotiations that took place between 1984 and 1986 over the structure of IAE. The goal of these consultations and negotiations was to develop a corporate structure that would minimize the U.S. tax liability of all consortium members.

## II. DISCUSSION OF ATTORNEY–CLIENT PRIVILEGE

### A. THE COMMON INTEREST RULE

The attorney-client privilege protects from disclosure "confidential communications that pass in the course of professional employment from client to lawyer." *U.S. v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). The privilege protects "both information pro-

vided to the lawyer by the client and professional advice given by an attorney that discloses such information." *In re Six Grand Jury Witnesses,* 979 F.2d 939, 944 (2d Cir. 1992). In addition, "[i]nformation provided to an accountant by a client at the behest of his attorney for the purposes of interpretation and analysis is privileged to the extent that it is imparted in connection with the legal representation." *Schwimmer,* 892 F.2d at 243.

■ Once a privileged communication has been disclosed purposely to a third party, the attorney-client privilege is waived, unless the disclosed material falls under the common interest rule. This rule "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* at 243 (citations and internal quotation marks omitted). The parties claiming protection under the rule must share "a common interest about a legal matter" but "it is ... unnecessary that there be actual litigation in progress...." *Id.* at 243–44. "[A] claim resting on the common interest rule requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given." *Id.* at 244.

Two district court cases from this circuit shed light on the operation of the common interest rule in the business context. In *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437 (S.D.N.Y.1995), Bank Brussels Lambert (BBL), a member of a banking consortium, circulated a letter from its attorney among other members of the group. The letter concerned "the viability of a potential transaction, and one of the issues addressed in that letter was possible litigation." *Id.* at 448. When the consortium subsequently brought suit, the defendants tried to obtain the letter, claiming that its disclosure to the other banks constituted a waiver of attorney-client privilege. BBL argued that the disclosure fell under the common interest rule. The court held that the letter was not privileged because "the common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." *Id.* at 447. The court then went on to discuss the factors supporting its conclusion that the banks had no common *legal* strategy:

> Coudert Brothers [the BBL counsel who wrote the letter] ... represented only BBL and was not retained to represent the Bank Group as a whole or any of its other members. Nor is there any suggestion that counsel from that firm coordinated its legal efforts with attorneys for any other Bank Group member. Indeed, there is no indication that counsel were even present at the meeting where representatives of the Bank Group reviewed the Coudert Letter.

*Id.* at 448.

In *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508 (D.Conn.1976), Judge Newman applied the common interest rule in three different business contexts. The first involved protracted negotiations between Xerox and the Rank Organization over the price at which Rank would be willing to sell control of the companies' joint venture. The court found that the negotiations only tangentially involved legal issues, and, therefore, the common interest rule did not protect information exchanged during the negotiations. According to the court, "[t]he communications ... were not directed at advancing the joint interest vis-à-vis the rest of the world. Instead the parties were negotiating a business proposition among themselves." *Id.* at 513.

Xerox also claimed that the common interest rule protected from discovery the proceedings of a patent committee, which comprised an individual named Chester Carlson and representatives of Xerox and the Battelle Memorial Institute. The purpose of the committee was to consider the patent structure for xerography patents. In this context, Judge Newman held that the common interest rule did apply:

> Chester Carlson, Battelle, and Xerox shared a business interest in the successful exploitation of certain patents. Whether the legal advice was focused on pending litigation or on developing a patent program that would afford maximum protec-

tion, the privilege should not be denied when the common interest is clear. In this setting of joint analysis and cooperative study, the three parties' common interest in patent protection predominated.

*Id.* at 514 (citations omitted).

The final issue relevant to the case at bar is the privilege a Xerox executive claimed in regard to deposition questions that would have forced him to reveal legal advice passed on to him by another executive. In this context, Judge Newman ruled that "[a] privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation." *Id.* at 518.

## B. APPLICATION OF THE CASE LAW TO THE DOCUMENTS IN THIS CASE

UTC bases its claim of attorney-client privilege on several assertions of fact. First and foremost, it claims that there was a common understanding among the members of the consortium that legal advice produced by the in-house or outside counsel of one consortium member would be shared with counsel from the other parties and that executives from one member could seek legal advice from the counsel of any other member. (Resp't's Mem. in Support of Mot. to Quash, p. 6 and accompanying exhibits.) This shared advice was released to a given member's executives strictly on a need-to-know basis. (*Id.*) UTC also claims that representatives of the members met periodically to "discuss and analyze outstanding legal issues," and the communications surrounding these meetings were likewise kept in strictest confidence. (*Id.*, p. 7 and accompanying exhibits.) Finally, UTC says that all members shared a common legal interest in structuring IAE in such a way as to minimize their tax liability. (*Id.*, pp. 8–9 and accompanying exhibits.)

The IRS replies that UTC is stretching the common interest rule far beyond its intended purpose. It claims that the consortium members shared only a common *business* interest, and the discussions regarding the structure of IAE were more in the nature of negotiations between adverse parties than consultations among collaborators. (Pet'r's Opp'n to Mot. to Quash, p. 8.)

 In light of the case law discussed above, the court finds that the attorney-client privilege, as extended by the common interest rule, protects from disclosure all the documents at issue except for Document 14. Although, in the area of taxation, it is often difficult to determine where business ends and the law begins, the court finds that nearly all the documents pertain to the development of a common legal strategy regarding the tax structure of IAE. In formulating this strategy, the members acted not as adversaries negotiating at arms length but as collaborators, legally committed to a cooperative venture and seeking to make that venture maximally profitable. The process revealed in the documents was not without hostility, but it appears to have been closer to the "joint analysis and cooperative study" of Xerox's patent committee than to the price negotiation of the Rank–Xerox transaction. Moreover, unlike the lawyers in *Bank Brussels Lambert*, the attorneys for each of the IAE collaborators advised the other members and coordinated their legal efforts. Finally, UTC has provided affidavits attesting to the fact that the documents were disclosed only to persons "who share[d] responsibility for the subject matter underlying the consultation." *SCM*, 70 F.R.D. at 518.

## C. DESCRIPTION AND ANALYSIS OF THE INDIVIDUAL DOCUMENTS

### NONPRIVILEGED DOCUMENT

Document 14: A June 1982 memo from a UTC financial analyst to the company's in-house counsel analyzing the proposed Agreement from a financial perspective.

Finding: This document represents financial advice, rendered for a business purpose, with no direct legal implications.

### PRIVILEGED DOCUMENTS

TYPE 1

Document 15: A June 1982 memo from the head of UTC's tax department to the compa-

ny's in-house counsel. The memo discusses the tax consequences of IAE's structure.

Finding: This document was prepared by another agent of UTC to assist counsel in providing legal advice to the company.

## TYPE 2

Document 16: A June 1982 memo from the head of UTIC's tax department to the company's in-house counsel requesting legal advice on the significance and application of a tax ruling.

Document 3b: An August 1985 letter from UTC's in-house counsel to the company's Swiss outside counsel asking for legal advice.

Finding: In these documents, agents of UTC supplied information to the company's attorney in order to receive legal advice.

## TYPE 3

Document 2/21: An April 1985 memo from UTC's in-house counsel to a colleague in the counsel's office and UTC executives. The memo presents the attorney's notes on an April 1985 meeting at which representatives of the consortium members discussed IAE's structure from a tax perspective. The memo records the opinions of outside Swiss counsel and the consortium members, including UTC's in-house counsel, regarding the effect of Swiss and U.S. tax law on IAE.

Document 3a/20: A September 1985 memo from UTC's in-house counsel to his file. The memo records the attorney's notes from a September 1985 meeting at which representatives of the consortium members discussed IAE's structure from a tax perspective. The memo contains the opinions of the consortium members, including UTC's in-house counsel, regarding the effect of Swiss and U.S. tax law on IAE.

Finding: These documents contain an exchange of legal advice among attorneys engaged in developing a common legal strategy.

## TYPE 4

Document 9: A February 1986 memo from UTC's in-house counsel to a UTC executive describing a February 1986 meeting at which the parties finally agreed on IAE's structure.

Finding: In this document, UTC's attorney reports on the results of legal consultations undertaken at UTC's behest.

## TYPE 5

Document 25: A November 1984 memo sent by the head of UTC's tax department to an IAE executive discussing the tax department's concerns regarding the structure of IAE. The memo was reviewed by UTC's outside U.S. tax counsel, and, according to UTC, it was prepared at the request of UTC's in-house counsel.

Document 3L: A draft and final version of a March 1985 letter from the head of UTC's tax department to the commercial director of Fiat. The draft was reviewed and approved by UTC's in-house counsel. The letter describes UTC's position on the implications of Italy's tax treaties with the U.S. and the U.K. and asks to discuss the issues raised with Fiat's tax advisors.

Finding: In these documents, an agent of UTC and the company's attorneys provide an analysis to assist in the development of a common legal strategy.

## TYPE 6

Documents 3f/19 and 3h/18: March 1985 memos from UTC's in-house counsel to representatives of the other consortium members regarding changes that the members were planning to make in the proposed agreement on IAE's structure.

Document 11: An August 1985 memo from UTC's in-house counsel to representatives of the other consortium members regarding UTC's position on the proposed amendments to the Agreement.

Finding: These documents contain legal advice from UTC's attorney intended to assist in the development of a common legal strategy.

## TYPE 7

Document 3n/5: A December 1984 memo from an IAE executive to UTC's in-house counsel presenting IAE's view of UTC's proposal to amend the Agreement.

Document 4: A January 1985 memo from Rolls to representatives of other members, including UTC's in-house counsel, responding to a proposal for structuring IAE made by

UTC's tax counsel and offering an alternative.

Document 3k: A March 1985 memo from Rolls to a representative of MTU, copied to representatives of other members, including UTC's in-house counsel. The memo lays out the final issues that need to be resolved before agreement can be reached on amendments to the Agreement and solicits the comments of the recipients.

Document 3j: A March 1985 memo from Fiat to Rolls, copied to representatives of the other members, including UTC's in-house counsel, presenting the opinion of Fiat's tax advisers on IAE's structure.

Document 3m1 and 3m2: March 1985 memos from JAEC to Rolls, copied to other consortium members, including UTC's in-house counsel. The memos present the opinion of JAEC's tax advisers on IAE's structure.

Document 29: An April 1985 memo from Rolls to representatives of MTU, copied to representatives of the other members, including UTC's in-house counsel. The memo presents suggestions for funding IAE's Swiss entity. Attached to the memo were other memos from IAE discussing various aspects of the company's finances and accounting.

Document 26: An April 1985 memo from Rolls to UTC's in-house counsel summarizing the various proposals for structuring IAE and asking for confirmation and comments. Attached to the memo are other memos to the parties from Rolls and IAE discussing the outstanding tax issues, including a memo summarizing legal advice provided by IAE's Swiss counsel.

Document 3i: An August 1985 memo from Rolls to UTC's in-house counsel posing legal questions about the structure of IAE as proposed by UTC.

Document 32: A January 1986 memo from JAEC's senior managing director to representatives of all the parties, including UTC's in-house counsel. The memo presents the opinion of JAEC's accounting firm on IAE's structure and asks for comments at an upcoming meeting.

Document 34: A March 1986 memo from an IAE executive to UTC's in-house counsel and representatives of the other members discussing an evaluation of IAE's structure by the accounting firm Touche Ross. The IAE executive asks for the recipients' responses.

Document 35: A May 1986 memo from an IAE executive to UTC's in-house counsel and representatives of the other members passing on the legal opinion of IAE's outside Swiss counsel regarding the status of IAE under Swiss law.

Finding: These documents provide information to UTC's attorney so that he can assist in the development of a common legal strategy or provide direct legal advice.

TYPE 8

Document 36: A June 1986 letter from Rolls to IAE's outside Swiss counsel, copied to UTC's in-house counsel and an IAE executive. The letter seeks advice on Swiss tax law and the U.S.-Swiss tax treaty in light of decisions regarding the structure of IAE.

Finding: This document provides information to IAE's attorney in order to receive advice on the development of a common legal strategy.

## III. DISCUSSION OF WORK PRODUCT PRIVILEGE

"To invoke [the work product] privilege, a party generally must show that the documents were prepared principally or exclusively to assist in anticipated litigation." *U.S. v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996). "The purpose of the doctrine is to establish a zone of privacy for strategic litigation planning and to prevent one party from piggybacking on the adversary's preparation." *U.S. v. Adlman*, 68 F.3d 1495, 1501 (2d Cir.1995).

In *U.S. v. El Paso Co.* 682 F.2d 530 (5th Cir.1982), the Fifth Circuit considered whether a company's "tax pool analysis" warranted protection under the work product doctrine. A tax pool is an account set aside by a corporation to cover tax liabilities that would be created should the IRS successfully challenge interpretations made in preparing

the company's tax return. The purpose of the tax pool analysis is to "pinpoint[ ] the soft spots on the corporation's tax returns and indicate[ ] those areas in which the taxpayer has taken a position that may, upon challenge, negotiation, or litigation, require the payment of more taxes." *Id.* at 534. In rejecting El Paso's effort to protect its analysis from an IRS summons, the Court of Appeals said

> [w]e recognize that the tax pool analysis involves weighing legal arguments, predicting the stance of the IRS, and forecasting the ultimate likelihood of sustaining El Paso's position in court. Nevertheless, this analysis ... is not an end in itself: the memoranda underlying the tax pool analysis do not map out El Paso's actual litigating strategy, should litigation occur.

*Id.* at 543. Similarly, the documents at issue here discuss whether various courses of action might trigger IRS action, but they are silent about what the consortium members could or should do in the event litigation actually begins.

Similar issues were considered by the district court in *Adlman.* In that case, a corporation's attorney was asked to assess the tax consequences of a merger between two subsidiaries, and he requested a memorandum on the subject from the company's accounting firm. When the IRS issued a summons for the memo during a subsequent investigation, the attorney claimed it was protected by work product privilege because it had been written in anticipation of an IRS challenge to the merger's tax treatment. The district court ruled that "[t]he possibility of future litigation based on a transaction which has not yet occurred" does not support a claim of work product privilege. *U.S. v. Adlman,* No. M–18–304, 1994 WL 191869 at *3 (S.D.N.Y. May 16, 1994). The Second Circuit vacated that specific holding, *Adlman,* 68 F.3d at 1501–02, but, on remand, the district court once again rejected the claim of privilege:

> The fact that information in the documents could also be helpful in preparing for litigation does not mean these documents fall under the work product privilege. The primary purpose of these documents was not to prepare for litigation; the primary purpose was to decide whether or not to go through with a multimillion dollar transaction.

*U.S. v. Adlman,* No. M–18–304 (WK), 1996 WL 84502 at *1 (S.D.N.Y. Feb.27, 1996). In the opinion of this court, the primary purpose of the documents at issue here was to find a legal way to avoid the most taxes, and coping with an IRS challenge was a consideration, not a goal. For this reason, UTC is not entitled to the protection of the work product privilege.

## IV. THE INADVERTENTLY DISCLOSED DOCUMENT

### A. BACKGROUND

As part of its investigation of UTC's tax liability, the IRS requested and received thousands of pages of documents. On January 18, 1994, as part of this voluntary disclosure process, UTC attorney Brian Kelleher informed IRS agent Robert Iannucci that a box of documents called File No. 50 was ready for his inspection. (Iannucci Decl. ¶ 7.) Kelleher also told Iannucci that privileged documents had been removed from the file, and he gave the agent a memo listing those documents. (*Id.*) While going through File No. 50, Iannucci found a November 1984 memo written by the head of UTC's tax department, C.W. Schick, in consultation with the company's outside tax counsel (Document 25, discussed above). (*Id.*) After reading the memo, Iannucci claims that he asked Kelleher why it had not been included on the list of privileged documents and that Kelleher said he did not think it was privileged. (*Id.*) Kelleher does not recall this conversation and says it would not have been his practice to make such a statement without first reviewing the document in its context. (Kelleher Decl. ¶¶ 11–12.) Apparently, Iannucci was disturbed by UTC's failure to withhold the document because, over the next several weeks, he discussed it with other IRS personnel and sent it to the IRS's district counsel. (Iannucci Decl. ¶ 7.)

Meanwhile, on January 31, 1994, Iannucci requested another box of documents, which UTC later referred to as the IAE Tax File. (Iannucci Decl. ¶ 8.) On February 9, 1994, UTC's tax audit manager, Paul Bousquet,

**116**

informed Iannucci that all the documents in that file were privileged, and, a week later, Bousquet provided Iannucci with a list of the documents. (*Id.*) Among the documents listed was one that appeared to be the previously disclosed Schick memo.

In July 1995, the Justice Department informed UTC's outside counsel, Harold Heltzer, that the IRS had been given the memo by Kelleher, and Heltzer immediately requested that it be returned. (Heltzer Decl., ¶¶ 5, 7–8.) According to Heltzer, no one in UTC or its outside counsel's office was aware, prior to July 1995, that the Schick memo had been turned over to the IRS. (Heltzer Decl. ¶ 6.)

## B. UTC'S INADVERTENT DISCLOSURE DOES NOT WAIVE ATTORNEY–CLIENT PRIVILEGE

 In order to determine whether an inadvertent disclosure of documents should be considered an irrevocable waiver of privilege, courts in this circuit have looked at the following factors: a) whether the disclosing party took reasonable precautions to prevent disclosure; b) the speed at which the disclosing party acted to rectify its mistake; c) the overall volume of documents produced in discovery; d) the number of inadvertent disclosures included among those documents; and e) fairness. *Bank Brussels Lambert*, 160 F.R.D. at 443; *Hydraflow, Inc. v. Enidine, Inc.*, 145 F.R.D. 626, 637 (W.D.N.Y.1993); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y.1985).

In the case at bar, these factors weigh in favor of UTC. The company made a reasonable effort to sort through a huge volume of documents in order to withhold those that it considered privileged. Out of the thousands of pages that it produced, only one document appears to have slipped through the cracks. A few weeks after the Schick memo was accidentally disclosed, UTC properly withheld another copy of the same document, and, as soon as the company discovered its mistake, it asked that the memo be returned. In light of these factors and the court's decision upholding UTC's claim of attorney-client privilege, the IRS must return the document to UTC.

## V. CONCLUSION

For the reasons stated above, the Petition to Enforce Internal Revenue Service Summons (Document No. 1) is granted as to Bousquet Memorandum Document No. 14 (Memorandum from C.J. Weddle to J.B. Fahey, dated June 11, 1982) and denied as to all other documents. Respondent's Motion to Quash Internal Revenue Service Summons (Document No. 11) is denied as to Bousquet Memorandum Document No. 14 and granted as to all other documents. Respondent's Motion for Protective Order for Return of Privileged Document (Document No. 9) is granted.

SO ORDERED.