[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE DISCOVERY
Questions Presented
I. Are communications between primary insurers and their reinsurers relevant, for discovery purposes, when a policyholder alleges its costs in defending an action are covered by the liability insurance it purchased from the defendant primary insurers?
II. Are defendant's objections to plaintiff's requests for information based on the attorney-client privilege proper in this context? CT Page 5684
III. Are defendant's objections to those requests for information based on the attorney-client privilege proper in this context?
Facts and Facts Alleged
North American Philips Corporation (NAPC) is a Delaware corporation.
It asserts here claims for liability insurance coverage for three separate claims. (The Underlying Actions).
First, NAPC had liability insurance policies from Allstate Insurance Company (Allstate) for the 1981-1982 policy year which provided coverage for claims against NAPC resulting from its advertising.
In January of 1982, Remington Products, Inc. sued NAPC in Connecticut alleging NAPC had engaged in unfair competition based, in part, on NAPC's advertising practices.[1]
On May 7, 1991, the court entered final judgment in favor of NAPC in that action. NAPC here claims that Allstate is liable for the costs NAPC incurred defending the Remington action. Allstate denies any liability for those costs.
The second and third Underlying Actions both fall under the same policies purchased for the 1984-1985 policy year. NAPC purchased liability insurance for that period from several insurance companies. Aetna Casualty and Surety Co. (Aetna), AIU Insurance Company (AIU), Federal Insurance Company (Federal), Granite State Insurance Company (Granite), International Insurance Company (International), Pacific Insurance Company (Pacific), Prudential Insurance Company (Prudential) and Republic Insurance Company (Republic) (Excess Carrier Defendants) and those policies also provide coverage for claims of injury due to advertising.
In U.S. Philips Corp. v. Windmere Corp., No. 84-25-8 (S.D. Fla.) (Windmere Action), NAPC and U.S. Philips (an affiliate of NAPC) named Windmere Corporation and Izumi Seimitsu Kogyo Kabushiki Kaisha (Izumi) as defendants. Windmere counterclaimed alleging that NAPC and U.S. Philips had engaged in unfair competition through their advertising practices.[2]
CT Page 5685
On a second trial the jury found against NAPC and awarded Windmere $29,881,419.00 in damages, plus recovery of Windmere's costs and attorney's fees. Those damages were trebled. Recently the parties agreed to a settlement of $57,000,000 in addition to $3,500,000 in attorney's fees and interest. NAPC has incurred defense costs in that action.
In U.S. Philips Corp. v. Sears, Roebuck Co., No. 85 C 5366 (N.D. Ill) Izumi was named as a defendant in a patent infringement claim. Izumi filed a counterclaim and third-party complaint against NAPC and U.S. Philips alleging, among other things, unfair competition through advertising practices (Izumi action).[3]
In December of 1987, the counterclaim was dismissed. NAPC has incurred $160,000 in defense costs so far in the Izumi Action and anticipates more expenses expenses and costs.
NAPC alleges that the defense costs incurred in the Windmere and the Izumi actions are covered by the policies for the 1984-1985 policy year because both made allegations that NAPC engaged in unfair competition through its advertising practices. NAPC claims that the excess carrier defendants should pay full defense costs for the two actions and that they should pay and indemnify NAPC for any liability ultimately resulting from the Windmere amd [and] Izumi actions. The Excess Carrier Defendants have denied any liability for the costs incurred in the Windmere or Izumi actions.
Each of the defendants had "reinsured" their obligation to NAPC. Reinsurance is a special form of insurance obtained by a primary insurance company to help spread the burden of indemnification. A reinsurance company typically contracts with an insurance company to cover a specific portion of the insurance company's obligation to indemnify a policyholder in the event of a valid claim. This insurance enables the insurance companies to write more policies than their reserves would otherwise sustain since it guarantees the ability to pay a part of all claims. The reinsurance contract is not with the insured/policyholder. When a valid claim is made, the insurance company pays the first level CT Page 5686 insured, and the reinsurance company pays the insurance company. Excess Casualty Reinsurance Association v. Insurance Commissioner, 656 F.2d 491, 492 (9th Cir. 1981). There are two specific types of reinsurance. When a reinsurer agrees to insure a portion of a specific, individual risk, the type of policy is called facultative reinsurance. Under treaty type reinsurance policies, the reinsurer agrees to reinsure specified categories of risk. Borg-Warner Corporation v. Liberty Mutual Insurance Company, et al., No. 88-539 (N.Y.Sup.Ct. June 20, 1990). The distinction in types of reinsurance is not crucial to the issue in this case.
On October 31, 1991 NAPC submitted their first set of interrogatories and production requests. Interrogatories numbered ten through thirteen asked for information about defendants' communications with defendants' reinsurance as follows:
 10. Have you conferred, discussed, corresponded or otherwise communicated with your reinsurers regarding the Underlying Actions involved in this action? If you answer in the affirmative, set forth and identify:
 (a) Each reinsurer with whom you conferred, discussed, corresponded, or otherwise communicated;
 (b) Each Underlying Action which was the subject of your conference . . . ;
(c) What each conference . . . concerned;
(d) What you said during each conference . . . ;
(e) What each reinsurer stated in response . . . ;
 (f) All persons who participated in such conference . . . ;
(g) All related documents.
 11. If you answered the preceding interrogatories in the negative, why have you not communicated CT Page 5687 or discussed the Underlying Actions at issue in this action with your reinsurers?
 12. Have you submitted a claim or claims to any of your reinsurers with regard to this coverage action? If your answer is in the affirmative, identify:
 (a) Each claim with regard to this coverage action which you have submitted to your reinsurers;
 (b) The reinsurer(s) to which you submitted each claim regarding this coverage action;
(c) The response of each insurer . . . ;
(d) All persons with knowledge of the facts; and
(e) All related documents.
 13. Have you conferred, discussed, corresponded, or otherwise communicated with your reinsurers regarding claims for Advertising Injury or Damage or Advertising Liability as defined in your insurance policies. If your answer is in the affirmative, set forth and/or identify:
(a) The reinsurer(s) with which you communicated;
 (b) Each claim which was the subject of your communication;
 (c) The context or contents of your communications to the reinsurer(s);
(d) The response of each reinsurer . . . ;
(e) All related documents.
Defendants objected to these interrogatories on three grounds: Irrelevancy, attorney-client privilege and under the work-product doctrine.
Law CT Page 5688
I. Relevancy
Determining the relevancy of the information NAPC seeks is our threshold inquiry. Under Connecticut Practice Book, Section 218 information is relevant if it is "reasonably calculated to lead to the discovery of admissible evidence."
NAPC asserts that communications between the defendants and their reinsurers are relevant because they may indicate the defendants' own interpretations of the policies in question. Further, because the defendants are currently denying any liability, this information may show whether or not the types of claims made by NAPC were anticipated by the defendants. Such information might in some instances rise to the level of admissions. For these reasons reinsurance communications are relevant. Borg-Warner Corp. v. Liberty Mutual Ins. Co., No. 88-539 (N.Y.Sup.Ct. June 20, 1990) (decision of special master for discovery), National Union Fire Ins. v. Stauffer Chem. Co., 558 A.2d 1091
(Del.Super.Ct. 1989) (the name of this case had been amended to National Union Fire Co. v. Rhone-Poulec Basic Chemical Co. and is cited both ways).
The defendants in this case have not articulated why the information sought by NAPC is not relevant. As a result, the court will examine each interrogatory to determine if the information sought is relevant.
Interrogatory 10 seeks information regarding defendants' communications with reinsurers addressing the Underlying Actions involved in this case. In particular, NAPC requests: (a) the identity of each reinsurer the defendant communicated with, (b) the identity of any Underlying Actions were the subject of these communications, (c)-(e) the content of these communications, (f) the persons who participated in these communications, and (g) all related documents. Plaintiff asserts that this information is relevant because it is reasonably calculated to lead to admissible evidence. Connecticut Practice Book, section 219. It could.
Subsections (a) through (f) of Interrogatory 10 are reasonably calculated to lead to admissions or contradictions. Subsection (g) (All related documents), however, is a catch-all inquiry that might withstand the CT Page 5689 relevancy standard but it is too broad and too vague.
Interrogatory 11 asks the defendants why they did not communicate with their reinsurers regarding the Underlying Actions, if they answered Interrogatory 10 in the negative. This inquiry seeks not facts but mental processes and resulting opinions.[4] Practice Book 219. NAPC wants to know whether the defendants communicated with their reinsurers at all and the content of those communications. It does not matter, for discovery purposes, why the defendant might not have communicated with their reinsurers. The information sought in Interrogatory 11 is irrelevant.
Interrogatory 12 asks the defendants if they have submitted any claims regarding the Underlying Actions to their reinsurers. In particular, NAPC asks for: (a) each claim submitted to a reinsurer with regard to this action, (b) the reinsurer to whom a claim was submitted, (c) the reinsurer's response, (d) all persons with knowledge of the facts, (e) all related documents.
The defendants do not have much of an argument for subsections (a) — (c), but are on stronger ground for subsections (d) and (e). Subsection (d) is too broad and vague for the defendant to answer at all as "the facts" is a global expression. What facts? The submissions? The claims themselves? The averages? It is impossible to determine what NAPC is asking.
Subsection (e) is irrelevant for the same reasons stated in regard to interrogatory 10(g).
Subsections (a) through (c) do seek relevant information.
Interrogatory 13 asks about communications in regard to claims and seeks: (a) the name of the reinsurer, (b) each claim which was subject of communication, (c) contents of communications, (d) reinsurers response, and (e) all related documents. The analysis of Interrogatory 13 is essentially the same as Number 10 and Number 12. Subsections (a) through (e) are relevant and subsection (e) is too broad and too vague. CT Page 5690
 II. The Attorney-Client Privilege and the Work Product Doctrine
Because the exercise of these protections tends to prevent full disclosure of the truth, their scope is narrowly construed. State v. Cascone, 195 Conn. 183 at 186,487 A.2d 186, appeal after remand 10 Conn. App. 163, cert. denied203 Conn. 808 (1985). The burden for proving facts essential to either the attorney-client privilege or the work-product doctrine is on the party asserting it. Tunick v. Day, Berry Howard, 40 Conn. Sup. 216 at 219, 486 A.2d 1147 (1984); Conoco, Inc. v. United States Dept. of Justice, 687 F.2d 724
(3rd Cir. 1982), resp.
A. The Attorney-Client Privilege
In Connecticut, the general rule for the attorney-client privilege is: "Communications between the client and his attorney are privileged when made in confidence for the purpose of seeking legal advice." State v. Burak, 201 Conn. 517, 526, 518 A.2d 639 (1986), citing, inter alia, Doyle v. Reeves, 112 Conn. 521, 523, 152 A. 882
(1931).
Interrogatory 10 asks about defendants' communications with reinsurers regarding the Underlying Actions involved in this action. This information is not protected by the attorney-client privilege because the original communications were not made in the attorney-client relationship, but in the insured-insurer relationship.
Defendants may argue that the communications that are protected are the second set of communications between the defendants and their attorneys, which include the original set of communications between the defendant and their reinsurers. This argument will not suffice. The original set of communications, which were made outside the attorney-client context, cannot be protected by later cloaking them with some attorney-client relationship. This would expand the privilege by permitting all communications to be protected by later giving them to an attorney. "Legal departments are not citadels into which public, business or technical information may be placed to defeat discovery . . ." SCM Corp. v. Xerox Corp., 70 F.R.D. 508 at 515 (1976). The information sought in interrogatory 10 is not protected by the attorney-client privilege. CT Page 5691
Interrogatory 11 is irrelevant and thus we need not consider the attorney-client privilege.
Interrogatory 12 asks the defendants if they have submitted any claim(s) to their reinsurers regarding the Underlying Claims in this action and what the reinsurers responses were. Those communications are not protected for the same reasons set out in regard to Interrogatory 10. Here, the original communications were made outside the attorney-client relationships. The purpose of those communications was clearly not to seek legal advice, but to see if NAPC's claims were covered by defendant's reinsurance coverage.
Interrogatory 13 is aimed at discovering if the defendants and their reinsurers ever communicated about advertising liability in regard to defendants' policies and if they did, what was the content of those communications? Those communications were outside the attorney-client relationship and not made for the purpose of seeking legal advice. The information sought in Interrogatory 13 is not protected by the privilege.
B. The Work-Product Doctrine
Our cases define work-product as "the result of an attorney's activities when those activities have been conducted with a view to pending or anticipated litigation." Stanley Works v. New Britain Redevelopment Agency, 155 Conn. 86,95, 230 A.2d 9 (1987). Our Practice Book 219 contains different language reading, in pertinent part, as follows:
 "a party may obtain discovery of documents and tangible things otherwise discoverable under Sec. 218 and prepared in anticipation of litigation or for trial by or for another party or by or for that party's respresentative [representative] only upon a showing that the party seeking discovery has a substantial need of the materials in preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall not order disclosure of the mental CT Page 5692 impressions, conclusions, legal opinions, or legal theories of an attorney or other representative of a party concerning the litigation."
When the required showing has been made the primary requirement the courts look for to determine the applicability of the work-product doctrine is that the documents were prepared in "anticipation of litigation." A secondary requirement is "attorney-involvement." Although that is not clearly spelled out in today's practice book the Stanley Works case commanded it in 1967 and Jacques v. Cassidy, 28 Conn. Sup. 212, 218-219 reinforced it in 1969. In addition, the last sentence of the first paragraph of Practice Book 219 clearly suggests that the prior part of of the section is a combination of two potential sources of material. First, there is material prepared by a party itself. This may be discovered if "the required showing has been made." But, secondly, some of such material may have been "prepared" by an attorney. But whether or not it was prepared by an attorney no disclosure may be had "of the mental impressions, conclusions, opinions or legal theories of an attorney . . . or a party concerning the litigation."
The practice book section diverges markedly from the Stanley Works rule that the work is "the result of an attorney's activities." The last sentence of the first paragraph of section 219 provides that the "mental impressions [etc.] . . . of an attorney or other representative of a party concerning the litigation" shall not be ordered disclosed. (Emphasis added).
1. Anticipation of Litigation
While the courts have had some difficulty in defining "anticipation of litigation" several courts have agreed on a similar approach. United States v. Gulf Oil Corp., 760 F.2d 292 (1985), Scott Paper Co. v. Ceilcote Co., Inc., 103 F.R.D. 591 (1984). In Gulf Oil, the court said: "Our inquiry should be to determine the primary motivating purpose behind the creation of the document." supra, at 297.
The courts have looked at a number of factors in order to evaluate the primary purpose for the preparation of the materials in question. First, a document prepared in the ordinary course of business is not prepared in anticipation CT Page 5693 of litigation. Stanley Works, supra 95; Advisory Committee Comments to Fed.R.Civ.P. 26(b)(3), 1970 Amendment. Courts have also looked at the temporal proximity of litigation and the likelihood of litigation to decide if materials were prepared in anticipation of litigation. Scott Paper, supra.
The likelihood of litigation is particularly useful in this analysis and courts have set a variety of standards in regard to this factor. In order for documents to qualify as attorney work-product there must have been an identifiable prospect of litigation i.e., specific claims that have already arisen at the time the documents were prepared. Fox v. California Sierra Financial Services, 12 F.R.D. 520
(N.D. Cal. 1988), citing Burlington v. Exxon Corp.,65 F.R.D. 26 (D. Md. 1974).
This standard is similar to those used in Connecticut cases to determine the likelihood of litigation. Our superior court has held that the work-product doctrine applies only to materials obtained or produced when a "specific legal action is pending or contemplated." Lieberman v. Freedom of Information Commission, 3 CSCR 711
at 712 (August 2, 1988, Ripley, J.). A more recent superior court decision follows this standard and holds that the doctrine applies only to materials prepared for a particular litigation that is either pending or reasonably anticipated. Carrier Corporation v. The Home Insurance Company, No. 35 23 83, 1992 Conn. Super. LEXIS 1713 (Conn.Super. June 10, 1992).
We now apply those standards to each interrogatory to determine if the "anticipation of litigation requirement" has been met.
Interrogatory 10 asks if the defendant has communicated with their reinsurers regarding the particular Underlying Actions involved in this action. First, we determine the primary motivation for these communications. Scott Paper Co., supra at 595. For purposes of this interrogatory, we can break down the communications with defendants' reinsurers into two categories: communications after defendants were notified of the Underlying Actions themselves and communications to defendants after they were notified of the final judgment in each Underlying Action. CT Page 5694
First, defendants may argue that communications with their reinsurers after notification of the Underlying Actions themselves were in anticipation of litigation because they were in response to the filing of the particular actions (Remington, Windmere and Izumi) for which the defendants might anticipate some liability. The defendants could find support for this argument in Fox v. California Sierra Financial Services, supra, where the court cited cases holding that there is no requirement that the litigation have already been commenced in order for the work-product doctrine to be operative. But the court went on to say "that there must be more than a remote possibility of litigation." Id. at 524. At the time of the communications in our case, there was no particular legal action pending against the defendants or contemplated by the defendants. Lieberman, supra 712. The defendants were only aware that claims had been made against NAPC. There was no indication of how those claims might turn out, or if NAPC would eventually try to recover from the defendants under their insurance policies for those claims. Therefore, the communications the defendants had after notice of the Underlying Actions were not protected by the work-product doctrine.
The defendants have a stronger argument for the protection of communications made with their reinsurer after they were notified that final judgments were entered in the Underlying Actions and for those communications made after plaintiff had filed filed suit against the defendants. In either of those two situations defendants can meet the standard the courts have used: litigation was either pending or reasonably anticipated. Carrier Corporation v. The Home Insurance Company, No. 35 23 83, 1992 Conn. Super. LEXIS 17133
(Conn.Super. June 10, 1992). It is clear that the communications made after the commencement of the NAPC's suit against the defendants may have been made "in anticipation of litigation." It would also be reasonable to expect that NAPC would try to recover costs incurred in defending the Underlying Actions from the defendants once the final judgments had been entered because, as the plaintiff alleges, that is exactly the type of expense plaintiff insured against.
Defendants' argument that the communications made after the commencement of the NAPC lawsuit against the defendants were not made in the ordinary course of business, but in CT Page 5695 anticipation of litigations was used successfully by defendants in Lawyers Title Ins. v. U.S. Fidelity Guar. Co., 122 F.R.D. 567 (N.D. Cal. 1988). There the court stated that "it is arguable that after a lawsuit is filed a `normal course of business' no longer exists with respect to the subject of that suit."
Interrogatory 11 has been disposed of.
Interrogatory 12 asks the defendants if they submitted any claims to their reinsurers "with regard to this coverage action."[5] Subsection (a) — (c) ask the defendant to identify each claim they submitted to the reinsurer, the identity of the reinsurer and the reinsurers response to the claim. Subsection (d) asks for all persons with knowledge of the facts. Subsection (e) asks for all related documents.
Defendants will argue that the purpose for these communications was in anticipation of litigation. Plaintiff will assert that the communications are not protected because they were made in the ordinary course of business. It will argue that it is the ordinary course of business for a primary insurer to submit notice of such actions to its reinsurer whenever they are served.
Subsections (a) — (c) ask for specific facts about the defendants' response to NAPC's action. These communications were made in anticipation of litigation.
The applicability of the work-product doctrine to subsections (d) and (e) cannot be determine with the questions phrased as they are. As stated earlier, these sections are irrelevant or too vague as they are written. Therefore, the answers to these questions are not discoverable.
Interrogatory 13 asks the defendants about their communications with their reinsurers regarding Advertising Liability, Damage or Injury as defined in their policies with their reinsurers. The analysis of this interrogatory is similar to Interrogatory 10. The communications should be broken down between those the defendants made after they received notification of the Underlying Actions and those they made after notice of final judgment in those actions. CT Page 5696
The defendants will argue that primary purpose of those communications after notification of the Underlying Actions was to determine potential liability in light of future litigation. The plaintiffs will argue that these communications were made in the ordinary course of business because there was no pending action, nor was one reasonably anticipated. Again, litigation was not reasonably anticipated at this point because there was no indication of what would become of the Underlying Actions. Using the same reasoning as in Interrogatory 10, the court finds that communications made with reinsurers after defendant's notification of the Underlying Actions are not protected by the work-product doctrine.
Communications made after the final judgments in the Underlying Actions or after NAPC commenced its action against the defendants are protected by the work-product doctrine. Again, the analysis here is similar to Interrogatory 10. Defendant's primary purpose for these communications was, arguably, to aid in the reasonably contemplated litigation that would result from the final judgments in the Underlying Actions.
2. Attorney-involvement
The "attorney-involvement" requirement is defined as follows: "the attorney's work must have formed an essential step in the procurement of the data which opponent seeks, and the attorney must have performed duties normally attended to by attorneys." Stanley Works v. New Britain Redevelopment Agency, supra 95. The Connecticut Practice Book does not contain such a requirement. There has been some controversy over whether the Connecticut Practice Book changed the attorney involvement requirement, but this has been addressed in a recent unreported superior court decision. Relying on a series of Connecticut cases, the superior court notes that since the adoption of section 219, numerous cases have still cited Stanley Works and required attorney involvement as a necessary element of the work-product doctrine. Therefore, the court held that attorney involvement is a requirement for the work product doctrine. Carrier Corporation v. The Home Insurance Company, No. 35 23 83, 1992 Conn. Super. LEXIS 1713
(Conn.Super. June 10, 1982), Sunwood Condominium Association, Inbc. [Inc.] v. Donald H. Buddenhagen, et al., CT Page 5697 No. CV89-029262Sm 1991 Conn. Super. LEXIS 2414
(Conn.Super. October 29, 1991).
The requirement for attorney-involvement is best defined in Stanley Works supra 95 requiring that the lawyer's work be an essential step in the procurement of the information and a normal duty of a lawyer.
Using those rules together with the absence of evidence that any attorney was involved in the procurement of the information NAPC seeks, the court finds no attorney involvement and the work-product principle is not applicable.
Defendant's objections to Interrogatory 10(g); 11; 12(d) and (e); and 13(e) are sustained. All other objections are overruled.
N. O'Neill, J.